**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 20-31585-11** |
| **PEARL RESOURCES LLC** | § | |
| | § | **CASE NO. 20-31586-11** |
| **PEARL RESOURCES OPERATING** | § | **(Chapter 11)** |
| **CO. LLC** | § | |
| *Debtors* | § | |
| | § | **Jointly Administered Under** |
| | § | **Case No. 20-31585-11** |
| | § | **Judge Eduardo V. Rodriguez** |
| | § | |

**Debtors' Plan of Reorganization for Small Business Under Subchapter V of Chapter 11**

      Debtors Pearl Resources LLC (sometimes referred to individually as "Pearl Resources")
and Pearl Resources Operating Co. LLC (sometimes referred to individually as "Pearl Operating")
(collectively, the Debtors are referred to herein as the "Debtors"), file this Plan of Reorganization
(the "Plan") under Subchapter V of Chapter 11, and pursuant to 11 U.S.C. §§ 1189 and 1190.  As
required under the Bankruptcy Code (the "Code"), the Plan classifies claims and interests in
various classes according to their right to priority of payments as provided under the Code.  The
Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides
the treatment each class will receive under the Plan.

      The Bankruptcy Court (the "Court") will be asked by the Debtors to confirm this Plan.  If
the Court confirms the Plan, then the Plan will be binding on the Debtors, all creditors and interest
holders, and other parties-in-interest in this jointly administered case.

**Please read this document carefully and consult with your legal advisor.**

**Background**

**A.     Description and History of the Debtor's Business**

Debtors are Texas limited liability companies with their corporate offices in Houston, Texas.  The Debtors have outsourced to third parties of the operational aspects of their business, except for their finance and administrative function.

Myra A. Dria ("Dria") manages the Debtors' finances, administrative functions, and directs operations of their third-party contractors.

The primary asset of the Debtors are oil and gas leases located in Pecos County, Texas. The Debtors have under lease 2,240 acres in Pecos County, Texas.  This acreage's legal description is H&GN RR Survey, Pecos County, Block 8 Sections S/2 20, E/2 40, W/2 41, 42, and 44 located on the south bank of the Pecos River.  In addition, the Debtors are in a dispute concerning an additional 320 acres located in the south half of Section 22 (see discussion below regarding the GLO (Texas General Land Office) dispute).

Adjacent operators are Jagged Peak Energy Inc. ("Jagged Peak") and Parsley Energy LLC ("Parsley"), both publicly owned entities.  Jagged Peak was acquired by Parsley in January 2020.

Dria is the founder and the Managing Member of Pearl Resources and through Pearl Resources, the Managing Member of Pearl Operating.  She graduated from University of Texas with a Ph. D. in Petroleum Engineering with Honors in 1988.

The first company Dria founded and led as CEO, Opal Resources, was initially backed with $60 million from a Goldman Sachs affiliate and sold its core asset 3 years later to W&T Offshore for $400 million, having generated six times the original invested equity.

Debtors are Dria's second Permian Basin venture.  Debtors have extensive experience in creating value through integration and application of advanced drilling and proprietary completion

techniques, well monitoring, petrophysics, as well as geological/geophysical technology into identifying top quality assets capable of delivering superior production and financial results.

The Debtors' primary business has been to develop, design and build infrastructure to support drilling operations, and drill and manage new oil and gas wells with production batteries on its lease acreage in Pecos County.  The Debtors also operate two wells located in Pecos County: Brandenburg Well No.1 and the Garnet State No. 3.

1.  **Description of Debtors' Main Assets**

The Garnet State Lease legal description/location is H&GN RR Survey, Pecos County Block 8 Section S/2 20 (320 acres) and the Debtors hold this S/2 of Section 20 under a Relinquishment Lease with the State of Texas for the development of the oil and gas interests.  The Debtors also believe they are entitled to hold the S/2 of Section 22 (320 acres) also under that same Relinquishment Lease but this acreage is under dispute with the GLO (see below).  There is one Phantom (Wolfcamp) field oil and gas well, the Garnet State #3, which was drilled vertically to 11,000 ft in 2017 and completed with a one stage hydraulic frack.  Although the well has an installed pumping unit (American 456-320-120, 3 25 KVA transformer and 50 hp electric motor) with controller and new rods awaiting installation the well is currently producing naturally, flowing, under natural gas pressure.  This well is located on Section 20.  The well's casing pressure has remained at 650 psi since completion, complicating a normal rod installation.  Only the oil is sold and the gas is flared due to H2S.  Production currently averages 60 BO per month.  Two additional oil wells are permitted on Section 20, in the same field to Garnet State #3, but as horizontal wells, and have been drilled to 2000 ft with surface casing set and cemented to 2,000 ft. awaiting further drilling to 10,000 ft, addition of 5,000 ft lateral, and a hydraulically fracked completion.  A third well identical to these two has been drilled on Section 22 awaiting further drilling operations.  With current production, the S/2 of Section 20 (320 acres) is held by

production with this field (Phantom Wolfcamp) specification at 11,000 ft depth. The Phantom Wolfcamp is a proven interval on Sections 20 and 22 with producing wells encircling the position. This is also true despite the drop in commodity pricing as economic wells can be developed at less than $30/BO.

A production battery for Garnet State Lease exists on Section 20 with two 300 bbl production tanks, catwalks, and new vertical gunbarrel tank. A meter run with a Total Flow gauge was installed and upgraded. One separator exists at the well, and another separator exists at the battery flare to optimize liquid recovery from the gas stream. (see Case 20-31585 Dkt 54 on Schedule 46 for full equipment listing -- "the Garnet State Lease Equipment"). A 4-acre pad was built for the first smaller battery, and an 8-acre pad was built for the battery expansion for the horizontal well production and gas treatment facilities. The battery extension is where the flare is located for safety purposes.

For drilling and completion purposes, two water wells at either end of the S/2 of Section 20 lease were drilled and outfitted with downhole water well pumps and three (3) owned 45 KW portable Magnum Diesel Generators. Both water wells produce freshwater at 200+ GPM. There are three plastic-lined permanent frack pits and one unlined mega frack pit capable of holding an additional 1.5 MM Bbls of fresh water. Located at the north end of the S/2 of Section 20 two storage connex buildings are located for equipment storage. Additional casing and equipment is also stored at this location. Power poles and wire are installed extending the length of the section.

The South half of Section 22, a 320-acre tract under the State Lease (in dispute), holds an owned water well equipped with downhole pump capable of delivering 200+ bbls of freshwater per day. Another generator is placed at this location together with a 40,000 bbl freshwater lined frack pit. A third horizontal well, 5000 ft lateral is permitted and was drilled to 2000 ft with surface case set and cemented to this depth. The well pad and lined reserve pit have been built, together

with rat hole, cellar, and 2000 ft of cemented 13 3/8" J55 casing.  Intentions are to continue to drill the well to 10,000 ft and add a 5,000 ft lateral to this well.  An auxiliary battery pad has been built (5 acre) which would offer initial gas, oil, and water separation before transport across Section 21 easement to final processing on section 20 for delivery to pipelines.  A 72 acre development area has been fenced in with an 8-ft game fence and two 30-ft cantilevered gates.  A six well 10-acre drilling pad has also been built on the SE corner of the section.  A 100-ft wide, half mile pipeline, power, and road easement extends between Section 20 across Section 21 to Section 22.

The "Garnet State Lease Assets" as used in this Plan means the undisputed 320 acres located in the south half of Section 20 and the Garnet State Lease Equipment.

The Brandenburg Lease legal description is H&GN RR Survey, Pecos County Block 8 Section 40:E/2 containing 320 acres more or less;  H&GN Railway Company Survey, Block 8, Section 41: W/2, Pecos County, Texas and containing 320 acres more or less; H&GN Railway Company Survey, Block 8, Section 42: All, Pecos County, Texas and containing 640 acres more or less; H&GN Railway Company Survey, Block 8, Section 44: All, Pecos County, Texas and containing 640 acres more or less; comprising a total of 1,920 acres, more or less.

These are more or less adjacent sections with a majority of common mineral ownership across several hundred mineral owners.  The depths of the position were severed to some extent when the Yates interval at 2600 ft was first exploited in the 1930s and the original family ownership started selling portions of the other depths.  The Yates was developed on large spacing so remaining infill locations remain as "Proven", but the Debtors leased the interests of all of the original family members and subsequently added other interests which delivered a majority interest in all depths to the Debtors.  The ownership is extremely complicated, with many owners and transfers back and forth between various individuals and selling other interests in a royalty

trust making this leasehold title work extremely challenging and an expensive endeavor to decipher and obtain.

Subsequent to the Yates development was the Cherry Canyon at 5,000 ft and the Ellenburger at 20,000 ft depth. In 1979, AG Hill drilled the Brandenburg #1 well on Section 44 to the Ellenburger. The well was poorly tested and completed, with final testing and production occurring from the Fusselman followed by an Atoka completion. Production facilities were never installed and gas produced from these deep horizons was sent directly to pipeline. The Debtors acquired new leases when the well had been abandoned and non-producing for over 6 years and the well was part of the leasehold.

The Debtors, in 2013, after acquiring majority interests, hired a rig to conduct workover and cleanout operations. The target formation was the Woodford at 14,000 ft but the Debtors failed to reach the interval because of the junk that had been left in the hole. The well was plugged back to 12,650 ft, new casing run in and cemented and a 13 stage frack undertaken. The frack was executed poorly and the vendor failed to follow the required design. The well flowed for 6 months averaging around 100 BOPD and produced most of the frack sand injected during the job.

A full battery was constructed with four (4) 500 bbl tanks, separator, heater treater, flare, meter run, and was produced on gas lift for one year and rod pumped since 2015. The pumping unit is a 640-365-168 Shores Lift model run by a reconditioned Ajax E42. All of the Brandenburg equipment is described on Dkt 54, Schedule 46 (all of the Brandenburg equipment and the Brandenburg Lease property is referred to hereinafter as the "Brandenburg Lease Assets").

Through equity contribution and loans made to the Debtors by Dria starting in 2011, the Debtors spent a significant amount of capital, time and energy to develop the leased area in Pecos County. As a result, the nearly contiguous property to the Debtors' leased acreage fetched $21,000 per undeveloped mineral acre in two recent transactions closing in January and February 2020.

The Debtors operate in a highly competitive business, with competitors who have significantly stronger financial wherewithal.  Adjacent operator, Parsley, recently acquired Jagged Peak's adjacent 78,000-acre position for $2.3 billion.  Over the past 5 years, Parsley and Jagged Peak have drilled over 40 nearby horizontal wells.  These wells have established the existence of high-quality oil assets first identified by Debtors in the area through Dria's efforts.

Given the amount of production from each well, the price of the commodities and the extant litigation involving subcontractors and continual interference by Parsley and/or its agents, the Debtors have been losing money for some period of time.  In addition to her initial equity investment of more than $8,000,000 into the Debtors, Dria has loaned the Debtors over the last 10 years over $19,000,000 to develop production infrastructure to support drilling and completion operations, oil and gas gathering and processing facilities and to drill on the Debtors' oil and gas properties.

The Debtors' business has encountered numerous challenges in the last two years: low commodity prices and high service prices continued over an extended period.

2.     **Statutory Mineral Property Liens**

In October 2016, a wild well incident occurred during the drilling of the Garnet State #4 well by PDS Drilling, LLC pursuant to a Turnkey Drilling Contract with Debtor, Pearl Operating (the "Turnkey Contract").  Under the Turnkey Contract, Debtor Pearl Operating required PDS to provide its services on a fully Turnkey Basis which meant PDS was responsible to furnish equipment, labor, and perform services as described in the contract for a total specified sum. Debtor Pearl Operating was required to pay thirty percent (30%) of the contract amount up front with the remaining seventy percent (70%) due only upon delivery of a "successful well" as defined in the contract.   The Turnkey Contract also required PDS to fully indemnify Debtor Pearl Operating as PDS had complete control of the wellsite and was responsible for care, control or

7

custody of drilling operations.  PDS was also fully responsible for all expenses and damages in the event of a wild well incident.  Because of the wild well incident, PDS failed to deliver a successful well as defined in the Turnkey Contract because it and failed to drill to 11,000 ft, as well as meet other obligations.

After the wild well incident, PDS failed to pay amounts due to numerous subcontractors.  Many of these subcontractors asserted various claims against the Debtors in an effort to hold them responsible for PDS's obligations.  And many of these claimants also filed statutory mineral property liens against the Debtors' oil and gas properties and sued the Debtors to foreclose those liens.  PDS failed to live up to its obligations under the Turnkey Contract to indemnify Debtor Pearl Operating and to pay for services provided by PDS's subcontractors.  As a result of the wild well incident and PDS's breach of the Turnkey Contract, Debtors expended substantial resources and money to bring the well under control, plug and abandon the well, remediate pollution and other damage, and drill a replacement well to maintain the lease.  The Debtors paid for all of the services it contracted for.

Moreover, because PDS' failed to pay its vendors, its insurance did not pay many of the costs due to the fact that PDS' policies were reimbursement policies.  PDS abandoned the job before the rig was released in January 2017 as no vendors would respond to their work orders.  PDS was unable to contract for further services to bring the well under control (as defined by the Texas RRC) and it never delivered a successful well.

There have been fourteen lawsuits and/or liens filed against the Debtors relating to the PDS loss of control, totaling nearly $3.5 MM, where the parties have dropped their claims against Debtors and any related mineral property liens over the past 2 years.  However, despite the fact that most of PDS' subcontractors have released their mineral property liens against Debtors' mineral property, Allied OFS, LLC, Maverick Oil Tools LLC, and Pilot Thomas Logistics have

refused to release their liens and they continue to pursue claims against the Debtors which the Debtors believe are without merit.  The Debtors have objected to the claims filed by these PDS subcontractors and filed an Adversary Proceeding (Case No. 20-03077) seeking a court order to invalidate the mineral liens filed by these subcontractors.  While these subcontractors' claims are without merit in the Debtors' opinion, the time and costs of litigating against these claimants has been substantial.  The Debtors intend to seek recovery of their attorneys' fees against Maverick and Pilot.  The claims and causes of action asserted by Maverick and Pilot against the Debtors and Debtors' claims against them, as well as the Debtors' objections to the claims filed by Maverick and Pilot in the bankruptcy cases, have been consolidated and are all now pending in the above-referenced Adversary Proceeding.  As discussed below, the Debtors have reached a settlement with Allied.

3.      **Texas General Land Office ("GLO") Issues and Status**

State Lease M-113155 (the "State Lease") consists of dozens of undivided interest leases obtained under the Relinquishment Act that covers all of Section 20, Blk. 8, H&GN Ry Co. Survey, A-5206 and the S/2 of Section 22, Blk. 8, H&GN Ry Co. Survey, A-5208.  Many of the earliest undivided interest leases were dated in September and October of 2011 and had primary terms of 5 years.  Debtors acquired those leases in late 2012.  Additional leases were taken in 2014 with 5-year primary terms, and then others were taken in 2016 with one-year primary terms.[1]

The two sections covered by the State Lease are not contiguous, and neither section had access to a public road.  The nearest public road to Section 20 is FM 1776 about 1.5 miles to the

---

[1] Debtors also acquired undivided interest private leases covering Section 44, E/2 Section 40, W/2 Section 41 and Section 42 which lie to the east and south of the two sections covered by the State Lease. (See Exhibit A, map showing Debtors' leasehold in the area.)

west.  The nearest public roads to Section 22 are FM 1450 about 4 miles to the south and FM 1776 about 2.5 miles to the west.

In early 2013, Debtors contracted with Total Field Services to construct a road across Section 44[2] into Section 22.  Gaynor Brandenburg controlled the surface of Section 44, and Debtors paid him for the right to construct and use that road.  During 2013 and into 2014 Debtors were able access Section 22 using this route.  During that time frame Debtors drilled a water well on Section 22 and built and lined a 40,000 bbl. frac pit.  On February 27, 2014, Debtors installed a new lock on the gate going into Section 22 in anticipation of starting operations on its staked Garnet State No. 1 well.  However, on March 1, 2014, Gaynor Brandenburg removed all of Debtors' road and well stakes and placed an 18-wheel trailer rig across the road on the east side of the gate going into Section 22, blocking Debtors from using that road to access Section 22.  Gaynor Brandenburg finally moved the 18-wheel trailer rig away from the gate in 2018 (see below for further details).

In the meantime, Debtors were accessing Section 20 using a somewhat convoluted combination of an existing oil field lease road along the south line and east line of Section 13 that then went east into Section 24 and then south to the pipeline right-of-way running in a southwest to northeast direction; then using that right-of-way and then another pipeline right-of-way running in a southeast to northwest direction to get to the lease on Section 20.  Unfortunately, Debtors had no actual conveyance that gave it access along that route (although it had verbal permission to use the access route and pipeline rights-of-way), and its condition was such that it could not be used by any large or heavy vehicles and certainly not a drilling rig.

---

[2] Debtors re-entered and re-completed the Brandenburg #1 well and used the existing historical lease road under contract with Trees Ranch going north from FM 1450 to access that well.

After Gaynor Brandenburg blocked Debtors' access to Section 22 coming through Section 44, Debtors could only access Section 22 using the same path it used to reach Section 20 along the right-of way in Section 24.  But instead of turning to the northwest, Debtors and its contractors would simply follow the verbal right-of-way.  But again, although Debtors had verbal permission, there was no conveyance that authorized Debtors to use that route, and the condition of the right-of-way was such that it could not be used by any large or heavy vehicles and certainly not a drilling rig.

In 2016, Debtors were finally able to acquire all the undivided interest leases from the large number of persons owning an interest in the surface of Sections 20 and 22.  In June and July of 2016, Debtors' surveyor, John F. Watson & Company, completed the surveys of the locations for the Garnet State Well Nos. 1 and 2 on Section 22, and for the Garnet Well Nos. 3 in Section 20. In July 2016, Debtors began surveying a route from FM 1776 along the north lines of Sections 14, 24 and 21 that would provide Debtors legal access to both Sections 20 and 22, and the ability to bring in heavy equipment and a drilling rig to both sections.  In that same month, Debtors approached representatives of the Trees Ranch requesting an easement so it could get a rig on both sections to drill before the earliest expiration of the primary term on or about September 1, 2016. On August 5, 2016, Parsley let Debtors know that it had obtained the surface from Trees Ranch. Debtors' attempts to obtain an easement by agreement from FM 1776 were rejected by Parsley on August 5, 2016.[3]

Recognizing that its negotiations with Parsley were running into problems, Debtors were able to negotiate and obtain easements from Braden Bros. and from Walter Daggett III, et al that

---

[3] On August 5, 2016, Andrew Padgett with Parsley wrote an email to Debtors' representative stating that Parsley had retained Roger Harrison to manage the ranch Parsley had acquired from Trees Ranch, and that Roger Harrison would be the point of contact for dealings with Debtors on getting an easement.  Roger Harrison is one of the surface owners of Section 21, and he had already said "the only way Pearl will get a rig to Section 22 is by helicopter, and since I own Section 21 and operate as Parsley's ranch manager, I will do everything I can to prevent this access."

got Debtors access to at least Section 20, along the north and east lines of Section 13, and along the north line of Section 19.5.  But that did not get Debtors access to Section 22. (See below for actions taken by Debtors to gain access to Section 22.)

In August 2016, Debtors began in earnest to build out the road along the easements Debtors had obtained from Braden Bros. and Daggett.  In addition, during August and September 2016, Debtors surveyed the Garnet State No. 4 well, and began building the road, the location and the reserve and frac pits for that well on Section 20.  But that work came to a halt on August 29, 2016, when Ronnie Brandenburg, a surface owner AND party to the State's oil and gas lease, blocked Debtors' access to Section 20 by welding casing across the entrance that Debtors were using.  On August 30, 2016, Debtors had to file a lawsuit seeking a temporary injunction against Ronnie Brandenburg.  The court entered a temporary injunction against Ronnie Brandenburg in an order signed on September 9, 2016.

Recognizing that he couldn't simply lock Debtors out, Ronnie Brandenburg nonetheless continued his pattern of interference by granting easements to Outrigger Southern Delaware Operating, LLC ("Outrigger") on February 14, 2017, and to Grand Prix Pipeline ("Grand Prix") on September 8, 2017.  These easements gave both companies the authority to lay pipelines in an east-west direction across the southern part of Section 20, in the very areas that Debtors planned to place well pad sites for horizontal wells.  The pipeline companies proceeded with installing the pipeline under only one surface owner's agreement despite the Debtors filing a TRO against their actions.  It is also no coincidence that Ronnie Brandenburg, on July 12, 2017, granted an easement to Parsley to place electric lines and poles virtually anywhere Parsley wanted in the southern part of Section 20, which would run power to Parsley's operations on Section 24, even though Parsley had no need for such an easement on Section 20.  This easement granted Parsley the right to authorize others to use the powerlines and easement, but Debtors were expressly prohibited from

the use of the easement and power poles placed in its development area.  The impact of these three easements, granted solely by one surface owner, created a situation where pipeline and power line operations could and would interfere with Debtors' operations.

Meanwhile on August 12, 2016, Debtors made an offer for an access road across Section 21, as a predicate to an eminent domain proceeding so Debtors could access Section 22 with heavy equipment and a drilling rig.  Given that Roger Harrison (one of the Section 21 owners and a contractor hired by Parsley as Parsley's Ranch Manager) had already made it clear that the only way Debtors would get a drilling rig across Section 21 to Section 22 was by helicopter, it was no surprise that the initial offer and the attempts to negotiate an easement by agreement failed.  On March 1, 2017 Debtors filed its Original Petition and Statement for Condemnation for an access road across Section 21.  On February 18, 2018, an agreed final judgment was entered granting Debtors an easement across Section 21.

When Debtors' attempts to negotiate an easement across Section 21 appeared to be running into trouble, Debtors also filed a lawsuit against Gaynor Brandenburg on September 23, 2016 to have Gaynor Brandenburg's 18-wheel trailer rig removed.  Unfortunately, Debtors' request for a temporary injunction was not granted, and the litigation continued with Gaynor Brandenburg filing a counterclaim against Debtors.  Gaynor Brandenburg did finally move his trailer away from Debtors' gate accessing Section 22 in 2018.

In the meantime, in October 2016, PDS, Debtor Pearl Operating's drilling contractor, had moved a rig in to drill the Garnet State No. 4 well.  As explained above, PDS experienced a wild well incident that had to be brought under control and ultimately resulted in the well having to be plugged and abandoned on February 10, 2017.  On March 4, 2017, Debtors commenced drilling the Garnet State No. 3 well, and completed it as a producing well on June 30, 2017.

13

Shortly after Debtors completed the Garnet State No. 3 well and were ready to start on the surface work for pad sites to drill its 2021 HA and 2022 HA wells, Jagged Peak started crossing Debtors' exclusive easement to Section 20 that runs across the north line of Section 19.5 near its intersection with Section 13.  Jagged Peak laid surface lines, trenched to lay pipelines, installed power lines and burdened Debtors' easement with heavy traffic.  When Debtors tried to stop the interference, Jagged Peak filed a lawsuit on July 28, 2017.  That lawsuit continued for well over a year and was finally settled on October 12, 2018 by execution of a Reciprocal Use Agreement.

From October 2017 through January 2018, Targa/Grand Prix, Parsley and Outrigger bulldozed large areas, dug pipeline trenches, installed power poles and hung electric lines all over the southern part of Section 20 in Debtors' development area.  These various actions caused significant interference and delays to Debtors' attempts to commence operations on Sections 20.

**Basis and Duration of Suspension**

Section 52.0301 of the Texas Natural Resources Code provides, in part, "(i)f a lessee of a valid oil and gas lease granted by the state is unable to obtain access to the leased premises, . . . after diligent good faith attempt has been made by the lessee to obtain access to . . . the leased premises, the lessee may file with the board an application describing and giving the date of the action that deprives the lessee of access to . . . the leased premises."  The GLO and the School Land Board ("SLB") have recommended and approved suspension requests in the past when a lessee of a Relinquishment Act lease has been denied access.  For instance, in June 2019 the GLO staff recommended, and the SLB unanimously approved a suspension request by Siltstone Resources under §52.0301 on the basis that a surface owner rejected various access routes proposed by Siltstone to get to its proposed well location.

Debtor was denied access to Section 22 by two adjacent surface owners.  First, on March 1, 2014 when Gaynor Brandenburg, the son of the surface owner on Section 20, blocked Debtors'

access road from Section 44 to the east side of Section 22.  Then again by Roger Harrison, an owner of Section 21 and a contractor for Parsley, who prevented Debtors from accessing Section 22 on the west side until an agreed judgment was entered on February 28, 2018.  Accordingly, Debtors were denied access to Section 22 from March 1, 2014 through February 28, 2018, a period of 4 years.

Although Debtors cannot make a similar case that their access to Section 20 was denied, there were many instances beginning in 2016 and extending through 2019 where Debtors' operations were hampered and delayed, in large part due to the actions of the State's agent/surface owner, Ronnie Brandenburg.  As described above, after Debtors obtained access easements across Sections 13 and 19.5, on August 15, 2016, Ronnie Brandenburg blocked Debtors' access from August 29, 2016 until Debtors got a court to stop him on September 9, 2016.  But it didn't stop there.  The easements Ronnie Brandenburg granted to Targa/Grand Prix and Outrigger in 2017 gave them the right to trench, bulldoze and lay pipelines in the very area that Ronnie Brandenburg knew the Debtors were planning to put its well pad sites.  The easement Ronnie Brandenburg granted Parsley in 2017 gave it the right to construct power lines and power poles in the development area designated for Debtors' pad sites and explicitly stated the exclusion of the Debtors from the use of the powerlines, while granting use by any other third party.  These actions by the surface owner are clearly inconsistent with his fiduciary responsibilities to the State, and they did result in significant interference.

Debtors' access to its planned well pad sites in Section 20 were repeatedly hindered by the actions of contractors for Parsley, Targa/Grand Prix and Outrigger while they dug up Debtors' development area and installed their pipelines, power lines, power poles and related facilities.  Although Debtors were not denied access to Section 20 for the entire time, there were repeated instances of interference with its operations, most of which would not have occurred but for the

actions of Ronnie Brandenburg, the surface owner and agent for the State and, Roger Harrison, a contractor working for Parsley.

Based on the above facts and explanation, Debtors requested a suspension of the State Lease for the period from March 1, 2014 to February 28, 2018 while Debtors were denied access to Section 22. The GLO recommended the School Land Board deny the suspension request and filed an Adversary Proceeding (Case No. 20-03169) requesting the Court to determine the dispute. Subsequently, the School Land Board denied Debtors' request for a suspension. The Debtors have filed counterclaims.

4.  **Insurance Litigation**

Evanston Insurance Company ("Evanston") sued Debtors and PDS in Civil Action No. 4:17-cv-03158; Evanston Ins. Co. v. PDS Drilling, LLC, et al; in the United States District Court for the Southern District of Texas. RSUI Indemnity Company moved to intervene to assert claims against PDS and Debtors. The intervention was allowed by the court.

Evanston seeks a declaratory judgment that there is no coverage under a primary general liability policy and an excess insurance policy under which PDS was the insured and Debtors were additional insureds. Evanston alleges that various provisions of the policies preclude coverage for any claims asserted by Debtors. RSUI seeks a declaratory judgment that there is no coverage provided by a second layer excess insurance policy under which PDS was the insured and Debtors are additional insureds. RSUI asserts that various provisions of the underlying policies and the RSUI policy preclude coverage for any claims asserted by Debtors.

Debtors counterclaimed against Evanston seeking declaratory relief that Evanston is required to pay amounts Debtors are legally obligated to pay for property damages and asserting claims for breach of contract and violation of Chapter 542 of the Texas Insurance Code. Parties have engaged in written discovery, but dispositive motions have not been filed.

Debtors have claims against Travelers Insurance Company ("Travelers") for coverage with respect to claims made pursuant to a primary commercial general liability policy and an excess insurance policy under which the Debtors are the insured. Debtors believe there may be coverage under those policies for pollution cleanup costs, loss of underground resources and equipment and other claims. The policies issued by Travelers were paid for by the Debtors.

5.     **Nabors Litigation**

Nabors Drilling Technologies USA, Inc. ("Nabors") sued Debtors in Cause No. P-7880-83-CV in the 83rd Judicial District Court of Pecos County, Texas. Nabors provided drilling services and materials in connection with the Garnet State #3 Well to Debtor Pearl Operating pursuant to a Daywork Drilling Contract. Nabors filed a mineral property lien against Debtors' leasehold interest in the Garnet State Lease claiming it was owed $420,258.10. Among other things, Debtors disputed whether Nabors had actually provided certain services, the value of the services provided by Nabors, and whether Nabors had provided accurate invoices reflecting the services provided. Nabors sued Debtor Pearl Operating for breach of contract and sworn account. Nabors sued both Debtors in quantum meruit. Nabors sought declaratory judgment that: (1) the contract was valid and enforceable; (2) pursuant to the terms of contract Debtor Pearl Operating was precluded from asserting fraudulent inducement or relying on any extra-contractual representations; and (3) Debtor Pearl Operating was required to release Nabors from all claims resulting from its work on the well. Nabors further sought declaratory relief that its mineral property lien was valid and sought foreclosure of the lien.

Debtors counterclaimed asserting claims for breach of the warranty of workmanlike performance, breach of contract, and declaratory relief that the mineral property lien claim asserted by Nabors is invalid, that they had paid Nabors' charges despite the fact they were in excess of the

amounts agreed in the contract and that Debtors had paid sufficient amounts to discharge any obligations under the contract.

Prior to the bankruptcy filing, Nabors moved for summary judgment in Pecos County District Court seeking judgment on its affirmative claims as well as Debtors' breach of contract and warranty counterclaims. Debtors responded asserting that numerous fact issues preclude summary judgment regarding the obligations of the parties pursuant to the contract. Specifically, Debtors argued that there are fact issues regarding the amount due to Nabors, if any, under its claims for breach of contract and quantum meruit, that Nabors is not entitled to summary judgment on its mineral property lien claim because it cannot establish the amount of damages, that Pearl was fraudulently induced into signing the contract, and that the evidence established that Nabors breached the contract by overcharging for its services. The claims and causes of action of Nabors against the Debtors and the Debtors' claims against Nabors, as well as the Debtors' objections to the claims Nabors filed in the bankruptcy cases, have been consolidated and are all now pending in Adversary No. 20-03125.

6.      **Debtors' Compliance with the Code**

The Debtors have filed this Plan in good faith. Through Dria, they represent that the information contained herein is true and correct to the best of their knowledge and understanding. The Debtors believe that the Plan complies with all applicable provisions of the Code. The Debtors do not believe that Subsections (a)(6), (a)(13), (a)(14), and/or (a)(15) of Section 1129 of the Code are applicable to the Debtors or the Plan. The Debtors affirmatively assert that the Plan complies with the applicable provisions of the Code ((a)(1)), and has been proposed in good faith and not by any means forbidden by law ((a)(3)). Further, the Debtors affirmatively assert that they have complied with the applicable provisions of the Code ((a)(2)). The Debtors affirmatively assert that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of

the Debtors ((a)(11)).

**B.      Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached as Exhibit B and shows that all creditors of the Debtors would receive payment in full of their Allowed Claims in a Chapter 7 liquidation.  All Allowed Claims will be paid in full under this Plan.  The equity interests shall retain their ownership.

**C.      Ability to make future plan payments and operate without further reorganization**

The Debtors must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtors' business.

The Debtors have provided their asset valuation analysis as Exhibit C.

The Debtors have provided projected financial information attached as Exhibit D.

The Debtors' financial projections show that the Debtors will have projected Disposable Income for the period described in § 1191(c)(2) sufficient to pay all Allowed Claims in full with interest.

The final Plan payment is expected to be paid on the third-year anniversary of the Effective Date at the very latest.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

## Plan Terms

**Article 1: Summary**

This Plan of Reorganization (the Plan) under chapter 11 of the Bankruptcy Code (the Code) proposes to pay creditors of the Debtors from an infusion of capital, future income, loan proceeds

or, if necessary, sale of assets.

This Plan provides for:    Two classes of priority claims (classes 1 and 2);
Eight classes of secured claims (classes 3-10);
Two classes of non-priority unsecured clams (classes 11 and 12); and
One class of pre-petition insider unsecured claims (class 13)
One class of equity security holders (class 14).

Non-priority unsecured creditors holding Allowed Claims will receive distributions, which the Debtors have valued at one hundred percent (100%) of the amount of each Allowed Claim. This Plan also provides for the full payment of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2: Classification of Claims and Interests**

2.01   **Class 1**          All allowed claims entitled to priority under § 507(a) of the Code.

2.02   **Class 2**          The post-petition debtor-in-possession loan made by Dria to the Debtors.

2.03   **Class 3**          The agreed Allowed Claim of Allied OFS LLC ("Allied").

2.04   **Class 4**          The claim of Nabors Drilling Technologies USA, Inc. ("Nabors") to the extent allowed.

2.05   **Class 5**          The claim of Pilot Thomas Logistics LLC ("Pilot") to the extent allowed.

2.06   **Class 6**          The claim of Maverick Oil Tools, Inc. ("Maverick") to the extent allowed.

2.07   **Class 7**          the claim of Transcon Capital, LLC ("Transcon") to the extent allowed.

2.08   **Class 8**          The claim of Charger Services, LLC ("Charger") to the extent allowed.

| | | |
|---|---|---|
| 2.09 | **Class 9** | The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by Von Directional Services, LLC ("<u>Von Directional</u>") and any related claim against either of the Debtors. |
| 2.10 | **Class 10** | The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by RH Trucking, LLC (and Ricardo & Adelaida Huitron) and any related claim against either of the Debtors. |
| 2.11 | **Class 11** | All non-priority unsecured claims under § 502 of the Code. |
| 2.12 | **Class 12** | Potential creditors listed in Debtors' schedules as disputed but who did not file a proof of claim on or before the bar date of May 1, 2020. |
| 2.13 | **Class 13** | Pre-petition loans made by Dria to Debtors. |
| 2.14 | **Class 14** | The Equity Interests of Dria in Pearl Resources, and Pearl Resources in Pearl Operating. |

**Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees**

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1) of the Code, administrative expense claims, and priority tax claims are not in classes except for the Class 2 administrative expense claim. |
| 3.02 | **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtors. |
| 3.03 | **Priority tax claims** | Each holder of a priority tax claim will be paid in full within twenty (20) days of the Effective Date. |
| 3.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the Effective Date of this Plan have been paid or will be paid on the Effective Date. |
| 3.05 | **Subchapter V Trustee fees** | All approved Subchapter V Trustee fees will be paid within twenty (20) days of final Court approval of such fees. |

**Article 4: Treatment of Claims and Interests Under the Plan**

| | |
|---|---|
| 4.01 | **Claims and interests shall be treated as follows under this Plan:** |

Class 1          Priority claims (excluding those described in Article 3 above) are unimpaired.  They shall be paid in full within twenty (20) days of the Effective Date.  The Debtors do not believe any Class 1 claims exist.

Class 2          Myra Dria has made a debtor-in-possession loan (the "<u>DIP Loan</u>") to the Debtors pursuant to the Court's order (the "<u>DIP Loan Order</u>") dated March 31, 2020 (Docket No. 72).  Dria committed up to $500,000 under the DIP Loan.  Pursuant to the DIP Loan Order, Dria was granted superpriority administrative expense status under Section 364(c)(1) of the Code and the DIP Loan is entitled to the protections of Section 364(e) of the Code.  As of the date this Plan was filed, the amount outstanding under the DIP Loan is approximately $200,000.  On a quarterly basis until such time as Allowed Claims under Classes 4, 5, 6, 7, and/or 8 are paid in full, Class 2 shall be paid its pro-rata share (with the Allowed Claims under Classes 4, 5, 6, 7 and/or 8) of Disposable Income from and after the Effective Date.

Class 3          The Debtors and Allied have reached a settlement with respect to Allied's claim against both Debtors in the amount of $3,346,349.53.  Allied's Allowed Claim shall be $150,000.  Allied's Allowed Claim shall be paid as follows: (i) $100,000 on the Effective Date; and (ii) $50,000 on or before nine (9) months from the date of the Confirmation Order.  Allied agrees to release the statutory mineral property lien it filed pre-petition against the Debtors within ten (10) days of its receipt of $100,000.

Pursuant to Bankruptcy Code Section 1123(b), on and effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Allied shall be deemed released by the Debtors and their bankruptcy estates, and the Debtors and their bankruptcy estates shall be deemed released by Allied, from any and all claims, obligations, debts, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their bankruptcy estates, on the one hand, and Allied, on the other hand, have asserted or could have asserted, based on or relating to, or in any manner arising from, in whole or in part, the claims asserted in any litigation prior to the confirmation of this Plan, the Debtor's business dealings with Allied, and/or the pre-petition mineral lien recorded by Allied, and any matters related to the foregoing; provided however, such release does not include any of the Debtors' obligations to Allied under this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release of Allied's claims against the Debtors and the bankruptcy estates and the reciprocal release of the Debtors and the bankruptcy estates against Allied, and further, shall constitute the Bankruptcy Court's finding that the joint and mutual releases of the Debtors and the Bankruptcy estates, on one hand, and Allied,

on the other hand, is (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise, (c) in the best interests of the Debtors and their estates, (d) fair, equitable, and reasonable, (e) given and made after due notice and opportunity for hearing, and (f) a bar to the Debtors and the bankruptcy estates asserting any claims or causes of action released herein and a bar to Allied asserting any claims or causes of action released herein.

Class 4    The claim filed by Nabors is disputed.  Prior to the bankruptcy filing, Nabors filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("Nabors' Pre-Petition Lien").  Upon Confirmation of the Plan, Nabors' Pre-Petition Lien shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.  To the extent of the amount of Nabors' Allowed Claim, Nabors shall be given a replacement lien and security interest in the Garnet State Lease Collateral ("Nabors' Replacement Lien").

Nabors' Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full.  The Nabors' Replacement Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 5, 6, 7 and/or 8.  On a quarterly basis until paid in full, Nabors' Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 5, 6, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan.  Nabors' Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Nabors Payment Deadline").  If the Debtors fail to pay Nabors' Allowed Claim on or before the Nabors Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay Nabors' Allowed Claim in full.  If the Debtors fail to pay the Nabors' Allowed Claim in full on or before one year from the Nabors Payment Deadline, Nabors shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Replacement Lien.  Upon full payment of Nabors' Allowed Claim, Nabors shall execute and deliver to the Reorganized Debtors an instrument releasing its Replacement Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 5    The claim filed by Pilot is disputed.  Prior to the bankruptcy filing, Pilot filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("Pilot's Pre-Petition Lien").  Upon Confirmation of the Plan, Pilot's Pre-Petition Lien shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.  To the extent of the amount of Pilot's Allowed Claim, Pilot shall be given a replacement lien

and security interest in the Garnet State Lease Collateral ("Pilot's Replacement Lien").

Pilot's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full.  Pilot's Replacement Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 6, 7, and/or 8.  On a quarterly basis until paid in full, Pilot's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 4, 6, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan.  Pilot's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Pilot Payment Deadline").  If the Debtors fail to pay Pilot's Allowed Claim on or before the Pilot Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay Pilot's Allowed Claim in full.  If the Debtors fail to pay Pilot's Allowed Claim in full on or before one year from the Pilot Payment Deadline, Pilot shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Replacement Lien.  Upon full payment of Pilot's Allowed Claim, Pilot shall execute and deliver to the Reorganized Debtors an instrument releasing its Replacement Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

As alternative treatment of Class 5, Pilot may elect to accept $7,500 as its Allowed Claim in full and complete satisfaction of its Pre-Petition Lien and claims against the Debtors.  If Pilot elects this treatment, it will be paid $7,500 within twenty (20) days of the Effective Date and Pilot shall execute and deliver to Debtors' counsel within ten (10) days of the Effective Date a full and complete release of its Pre-Petition Lien in a form approved by the Court.  Pilot's election must be made in writing and accompany its ballot accepting the Plan.

Class 6     The claim filed by Maverick is disputed.  Prior to the bankruptcy filing, Maverick filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("Maverick's Pre-Petition Lien").  Upon confirmation of the Plan, Maverick's Pre-Petition Lien shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.  To the extent of the amount of Maverick's Allowed Claim, Maverick shall be given a replacement lien and security interest in the Garnet State Lease Collateral ("Maverick's Replacement Lien").

Maverick's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full.  Maverick's Replacement Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 7, and/or 8.  On a quarterly basis

until paid in full, Maverick's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Class 4, 5, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan.   Maverick's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Maverick Payment Deadline").   If the Debtors fail to pay Maverick's Allowed Claim on or before the Maverick Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay Maverick's Allowed Claim in full.   If the Debtors fail to pay Maverick's Allowed Claim in full on or before one year from the Maverick Payment Deadline, Maverick shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Replacement Lien.   Upon full payment of Maverick's Allowed Claim, Maverick shall execute and deliver to the Reorganized Debtors an instrument releasing its Replacement Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

As alternative treatment of Class 6, Maverick may elect to accept $7,500 as its Allowed Claim in full and complete satisfaction of its Pre-Petition Lien and claims against the Debtors.   If Maverick elects this treatment, it will be paid $7,500 within twenty (20) days of the Effective Date and Maverick shall execute and deliver to Debtors' counsel within ten (10) days of the Effective Date a full and complete release of its Pre-Petition Lien in a form approved by the Bankruptcy Court.   Maverick's election must be made in writing and accompany its ballot accepting the Plan.

Class 7   The claim filed by Transcon is disputed.   Prior to the bankruptcy filing, Transcon filed a statutory mineral property lien under Texas law and a statutory judgment lien that attached to certain of the Debtors' assets ("Transcon's Pre-Petition Lien").   Upon confirmation of the Plan, Transcon's Pre-Petition Lien shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.   To the extent of the amount of Transcon's Allowed Claim, Transcon shall be given a replacement lien in the Garnet State Lease Collateral ("Transcon's Replacement Lien").

Transcon's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. Transcon's Replacement Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 6, and/or 8.   On a quarterly basis until paid in full, Transcon's Allowed Claim shall be paid its pro-rata share (with Class 2 and Allowed Claims under Classes 4, 5, 6, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan.   Transcon's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Transcon Payment Deadline").   If the Debtors fail to pay Transcon's Allowed Claim on or

before the Transcon's Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay Transcon's Allowed Claim in full. If the Debtors fail to pay Transcon's Allowed Claim in full on or before one year from the Transcon Payment Deadline, Transcon shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Replacement Lien. Upon full payment of Transcon's Allowed Claim, Transcon shall execute and deliver to the Reorganized Debtors an instrument releasing its Replacement Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

As alternative treatment of Class 7, Transcon may elect to accept $7,500 as its Allowed Claim in full and complete satisfaction of its Pre-Petition Lien and claims against the Debtors. If Transcon elects this treatment, it will be paid $7,500 within twenty (20) days of the Effective Date and Transcon shall execute and deliver to Debtors' counsel within ten (10) days of the Effective Date a full and complete release of its Pre-Petition Lien in a form approved by the Bankruptcy Court. Transcon's election must be made in writing and accompany its ballot accepting the Plan.

Class 8     The claim filed by Charger is disputed. Prior to the bankruptcy filing, Charger filed a statutory judgment lien under Texas law that attached to certain of the Debtors' assets ("Charger's Pre-Petition Lien"). Upon confirmation of Plan, Charger's Pre-Petition Lien shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas. To the extent of the amount of Charger's Allowed Claim, Charger shall be given a replacement lien and security interest in the Garnet State Lease Collateral ("Charger's Replacement Lien").

Charger's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. Charger's Replacement Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 6, and/or 7. On a quarterly basis until paid in full, Charger's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 4, 5, 6, and/or 7) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. Charger's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Charger Payment Deadline"). If the Debtors fail to pay Charger's Allowed Claim on or before the Charger Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay Charger's Allowed Claim in full. If the Debtors fail to pay Charger's Allowed Claim in full on or before one year from the Charger Payment Deadline, Charger shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Replacement Lien. Upon full payment of Charger's

26

Allowed Claim, Charger shall execute and deliver to the Reorganized Debtors an instrument releasing its Replacement Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

As alternative treatment of Class 8, Charger may elect to accept $7,500 as its Allowed Claim in full and complete satisfaction of its Pre-Petition Lien and claims against the Debtors.  If Charger elects this treatment, it will be paid $7,500 within twenty (20) days of the Effective Date and Charger shall execute and deliver to Debtors' counsel within ten (10) days of the Effective Date a full and complete release of its Pre-Petition Lien in a form approved by the Bankruptcy Court.  Charger's election must be made in writing and accompany its ballot accepting the Plan.

Class 9         The statutory mineral property lien claim of Von Directional recorded pre-petition shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.  Von Directional shall not receive any recovery under this Plan.  Any pre-petition claim Von Directional has against the Debtors is released and the Debtors release any claim they may have against Von Directional.  Class 9 is disputed.  Class 9 is impaired.  Pursuant to Bankruptcy Code Section 1123(b), on and effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the holders of claims in Class 9 shall be deemed released by the Debtors and their bankruptcy estates, and the Debtors and their bankruptcy estates shall be deemed released by the holders of claims in Class 9, from any and all claims, obligations, debts, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their bankruptcy estates, on the one hand, and holders of claims in Class 9, on the other hand, have asserted or could have asserted, based on or relating to, or in any manner arising from, in whole or in part, the claims asserted in any litigation prior to the confirmation of this Plan, the Debtor's business dealings with holders of claims in Class 9, and/or the pre-petition mineral liens asserted by the holders of claims in Class 9, and any matters related to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release of Von Directional's claims against the Debtors and the bankruptcy estates and the reciprocal release of the Debtors and the bankruptcy estates of their claims against Von Directional, and further, shall constitute the Bankruptcy Court's finding that the joint and mutual releases of the Debtors and the Bankruptcy estates, on one hand, and Von Directional, on the other hand, are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise, (c) in the best interests of the Debtors and their estates, (d) fair, equitable, and reasonable, (e) given and made after due

notice and opportunity for hearing, and (f) a bar to the Debtors and the bankruptcy estates asserting any claims or causes of action released herein and a bar to Von Directional asserting any claims or causes of action released herein.

Class 10    The statutory mineral property lien claim of RH Trucking, LLC (and Ricardo & Adelaida Huitron) shall be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.  RH Trucking, LLC (and Ricardo & Adelaida Huitron) shall not receive any recovery under this Plan.  Class 10 is disputed.  Class 10 is impaired.

Class 11    All non-priority unsecured claims under Section 502 of the Code that are Allowed Claims shall accrue interest at the rate of four percent (4%) per annum from the Effective Date and shall be paid in full on the third (3rd) anniversary of the Effective Date.  To secure payment, holders of Class 11 Allowed Claims shall be given a second lien and security interest against the Debtors' Garnet State Lease Collateral on a *pari-pasu* basis.  In addition, once Allowed Claims under Classes 4, 5, 6, 7, and/or 8 are paid in full, Allowed Claims under Class 11 shall be paid their pro-rata share of the Debtors' Disposable Income on a quarterly basis until they are paid in full. The Debtors do not believe that any Class 11 creditors exist.  Thus, the Debtors do not believe there will be any Allowed Claims under Class 11. However, to the extent the Debtors are wrong and there are Class 11 Allowed Claims, Class 11 is impaired.

Class 12    All potential claims against the Debtors that were not filed in either bankruptcy estate on or before the bar date of May 1, 2021 that have not been separately classified.  This includes but is not limited to (i) Calvary Energy Services, Inc.; (ii) Vaquero Oilfield Services; (iii) Black Sheep OFS; (iv) D&R Engine; (v) Fenco Hydrovac; (vi) M&W Hot Oil; (vii) Mendford Trucking, LLC; (viii) Targa Midstream Services, LLC; (ix) West Texas Water Well Service; (x) Kenny Williams d/b/a Williams Pumping Service, (xi) Quik Water Services, and (xii) Garner Pump.  Parties within Class 12 shall not receive any recovery under the Plan.  Class 12 is impaired.

Class 13    Prior to the Debtors' bankruptcy filings, the Debtors' principal, Myra Dria, had loaned to the Debtors approximately $19,000,000.  Dria has agreed to subordinate these loans to any Allowed Claims and she will not receive any payments on account of these pre-petition loans unless and until all Allowed Claims are paid in full.

Class 14    The equity holder in Pearl Resources, Dria, shall retain her 100% ownership interest in Pearl Resources.  The equity holder in Pearl Operating, Pearl Resources, shall retain its 100% ownership interest in Pearl Operating.

## Article 5: Allowance and Disallowance of Claims

| | | |
|---|---|---|
| 5.01 | **Disputed claim** | A *disputed claim* is a claim that has not been allowed or disallowed *[by a final non- appealable order]*, and as to which either: |

    (i) a proof of claim has been filed or deemed filed, and either one of the Debtors or another party in interest has filed an objection; or

    (ii) no proof of claim has been filed, and either Debtor has scheduled such claim as disputed, contingent, or unliquidated.

| | | |
|---|---|---|
| 5.02 | **Timing for Objections** | The Debtors shall be entitled to file an objection to a governmental unit claim on or before the later of thirty days from the Effective Date or thirty days from the date a governmental unit files a claim.  The Debtors shall be entitled to file an objection to claims filed by any other creditors on or before thirty (30) days after the Effective Date.  These deadlines may be extended by the Court. |
| 5.03 | **Delay of distribution on a disputed claim** | No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. |
| 5.04 | **Settlement of disputed claims** | The Debtors will have the power and authority to settle and compromise a disputed claim after the Effective Date with Court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. |
| 5.05 | **Bankruptcy Court determination of a disputed claim** | The Court shall have the sole and exclusive jurisdiction authority to adjudicate a disputed claim and determine the amount in which any disputed claim shall be allowed and the extent to which any disputed claim is secured or unsecured. |

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| | | |
|---|---|---|
| 6.01 | **Assumed executory contracts and unexpired leases** | (a) The Debtors assume the following executory contracts and unexpired leases as of the Effective Date: |

    1. Crude Oil Purchase Agreement with Rio Energy International, Inc.
    2. Gas Purchase Agreement with Targa Midstream Services LLC

3. Mineral Leases (the Debtors do not believe that the Mineral Leases constitute leases under Texas law, but to the extent they are so treated, the Debtors assume them.)

(b) The Debtors are not in default under the foregoing executory contracts and unexpired leases and there is no cure amount due to the counterparties pre-bankruptcy filing and/or pre-confirmation.

## Article 7: Means for Implementation of the Plan

7.01 **Intercompany Debt**

The Debtors have a substantial amount of intercompany debt. The intercompany debt shall remain in place but no payments shall be made with respect to intercompany debt unless and until all Allowed Claims are paid in full.

7.02 **No Clean-Up Obligations**

A few years prior to the bankruptcy filing, the Texas Railroad Commission ("TRRC") issued Operator Clean-Up Program ("OCP") No. 08-5128 (Garnet State Well No. 4 Breakout). All work associated with OCP No. 08-5128 has been satisfied and is released. The Debtors have no further clean-up obligations as of the Petition Date and as of the date of the Plan. The Debtors shall have no clean up obligations after the Plan is confirmed.

7.03 **Disposable Income**

"Disposable Income" includes income that is received by the Debtors from its business operations that is not reasonably necessary to be expended for the payment of its expenditures necessary for the continuation, preservation, or operation of the Debtors' business. For avoidance of doubt, Disposable Income shall not include monies received by the Debtors from any recovery or settlement under the Debtors' insurance policies issued by Travelers.

7.04 **Exit Financing**

To the extent necessary to pay the Debtors' obligations under Article 3 of this Plan or Class 1 or Class 3, Debtors' principal, Dria, will loan to the reorganized Debtors funds necessary to pay those obligations from the unused amount of the DIP Loan. Until all Allowed Claims are paid in full, the Exit Financing shall be repaid in the same manner as the DIP Loan up to a total amount of $500,000 including the Exit Financing and DIP Loan in the aggregate. To the extent Exit Financing and the DIP Loan in the aggregate exceed $500,000, such excess shall be repaid from available cash that is not part of Disposable Income until such time as Allowed Claims are paid in full.

| 7.05 | **Reserved Claims** | The Debtors reserve the claims and causes of action as set forth on Exhibit E attached hereto. |
|---|---|---|

| 7.06 | **Replacement Collateral** | The Plan contemplates giving replacement liens to Classes 4, 5, 6, 7 and 8, to the extent of the amounts of their Allowed Claims, if any.  The Debtors conservatively value the Garnet State Lease Collateral at $7,440,000.  The total amount of the claims filed by holders of claims in Classes 4, 5, 6, 7, and 8 is approximately $1,151,287 in the aggregate.  The Debtors are providing nearly a 5 to 1 collateral to debt coverage even assuming the claims filed by holders of claims in Classes 4, 5, 6, 7, and 8 are allowed in full.  The Debtors believe that by leaving the west 160 acres of the south ½ of Section 20 unencumbered, it will increase significantly the opportunity to attract a drilling partner, which in turn will help facilitate the payment of Allowed Claims in Classes 4, 5, 6, 7, and 8. |
|---|---|---|

## Article 8: General Provisions

| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan (and not defined otherwise herein), and they are supplemented by the following definitions: |
|---|---|---|

- "Allowed Claim" – means a claim asserted against either of the Debtors which is either allowed under Debtors' Plan or by final order of the Court.

- "Confirmation Order" – means the Court's Order confirming the Debtors' Plan, as may be amended.

- "Petition Date" – means March 3, 2020

- "Mineral Leases" – means those Mineral Leases in which either of the Debtors is a Lessee and covering the subsurface of the acreage included within the Brandenburg Lease Assets and/or the Garnet State Lease Assets.

- "Garnet State Lease Collateral" – means all of the Garnet State Lease Assets save and except (i) the 160 acres located on the west side of the 320 acres located in the south half of Section 20, and (ii) GS 2021HA ($250,000), GS 2211HD ($250,000), and

one water well ($70,000) out of the Garnet State Lease Equipment.  Attached as Exhibit F is a more detailed description of the Garnet State Lease Collateral.

| | | |
|---|---|---|
| 8.02 | **Effective date** | The Effective Date of this Plan is the first business day following the date that is 20 days after the entry of the Confirmation Order.  If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 8.04 | **Binding effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |
| 8.06 | **Controlling Effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Texas govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
| 8.07 | **Corporate governance** | Dria will manage the Reorganized Debtors' business post-confirmation. |
| 8.08 | **Retention of Jurisdiction** | To the broadest extent allowable by law, the Court shall have continuing jurisdiction to interpret and enforce this Plan, including but not limited to by injunction and contempt. |
| 8.09 | **Vesting** | All property of the Pearl Resources estate is vested in Pearl Resources on the Effective Date, free and clear of all claims and encumbrances and/or charges except (i) the Garnet State Lease Collateral; (ii) as provided in the Plan and/or the Confirmation Order; and (iii) claims that are excepted from discharge under § 523 of the Code. |

All property of the Pearl Operating estate is vested in Pearl Operating on the Effective Date, free and clear of all claims and encumbrances and/or charges except (i) the Garnet State Lease Collateral; (ii) as provided in the Plan and/or the Confirmation Order and (iii) claims that are excepted from discharge under § 523 of the Code.

8.10 **Injunction**  Upon entry of the Confirmation Order, all holders of Claims against the Debtors or their bankruptcy estates shall be prohibited from asserting against the Debtors, the reorganized Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the date of entry of the Confirmation Order, whether or not such holder of a Claim filed a Proof of Claim.

8.11 **Lawsuits**  On the Effective Date, all lawsuits, litigation, administrative actions or other proceedings, judicial or administrative, in connection with any Claim against either of the Debtors, except for Adversary Proceedings pending in the Court as of the date of the Confirmation Order or Proof of Claim objections, shall be dismissed as to each of the Debtors. Such dismissal shall be with prejudice to the assertion of any such claim in any manner other than as prescribed by the Plan. All parties to any such actions shall be enjoined from taking any action to impede the immediate and unconditional dismissal of any such action. This provision does not apply to the Debtors' appeals of the pre-petition judgments in favor of Transcon and Charger and their related proceedings.

8.12 **Default**  If there is a default in payment of any Allowed Claim under the Plan, the default must be cured within 24 days of written notice of such default. If the default is not cured within such 24-day period, the creditor may seek any rights available under the Code or under applicable non-bankruptcy law.

8.13 **Notice**  Any notice to the Debtors must be in writing and sent by first class regular mail, certified mail-return receipt requested, and by email as follows:

Attn: Myra Dria
118 Paul Revere Dr.
Houston, Texas 77024
myra.dria@pearlresources.com

With a copy to:

> Walter J. Cicack
> Hawash Cicack & Gaston LLP
> 3401 Allen Parkway, Suite 200
> Houston, Texas 77019
> wcicack@hcgllp.com

## Article 9: Discharge – Subchapter V

If the Debtor's Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

> (i)  imposed by this Plan; or

> (ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

> (i)  on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or

> (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## Article 10: Other Provisions

| 10.01 | **Incorporation By Reference** | The Debtors' explanation of their history and their assets is incorporated into the Plan.  All documents referenced herein and/or attached hereto are incorporated into the Plan by reference. |
| 10.02 | **Plan Exhibits** | Exhibit A – Map of Debtors' Leasehold Interests |

Exhibit B – Liquidation Analysis

Exhibit C – Asset Valuation Analysis

Exhibit D – Cash Flow Analysis

Exhibit E – Reserved Claims

Exhibit F – Garnet State Lease Collateral

Date: July 1, 2020

Respectfully submitted,

Pearl Resources LLC and Pearl Resources Operating Co. LLC

By: _____          Myra Dria _____
　　Myra Dria, Manager

_____          Walter J. Cicack _____
HAWASH CICACK & GASTON LLP
3401 Allen Parkway, Suite 200
Houston, Texas 77019
(713) 658-9015 – tel/fax
**Counsel for Debtors**

35