

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
09/30/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **PEARL RESOURCES LLC**, *et al* | § | **CASE NO: 20-31585** |
| | § | |
| **PEARL RESOURCES OPERATING CO.** | § | **CASE NO: 20-31586** |
| **LLC** | § | |
| | § | **Jointly Administered Cases** |
| **Debtors** | § | |
| | § | **CHAPTER 11** |

## <u>MEMORANDUM OPINION</u>

Effective February 19, 2020, the Small Business Reorganization Act of 2019 ("*SBRA*") added new subchapter V provisions (11 U.S.C. §§ 1181–1195) designed to streamline the reorganization process for small business debtors. While the definition of a small business debtor under § 101(51D) has some conforming changes, the aggregate debt limit of $2,725,625 does not change. However, the Coronavirus Aid, Relief, and Economic Security Act has temporarily raised the aggregate debt limit to $7,500,000, effective March 25, 2020 and which sunsets on March 25, 2021. Thus, under the SBRA, a § 101(51D) "small business debtor" that files Chapter 11 has two options: (1) proceed as a subchapter V case by electing subchapter V, or (2) proceed as a BAPCPA "small business case" by not electing subchapter V. Pearl Resources LLC and Pearl Resources Operating Co. LLC both elected to proceed under subchapter V of Title 11 of the United States Bankruptcy Code.

As a matter of first impression, the Court conducted a contested confirmation hearing on the jointly administered subchapter V Debtors' plan of reorganization on August 13, 2020. At the conclusion, the Court ordered that a modified plan consistent with the Court's oral ruling be filed no later than August 20, 2020, took the matter under advisement and ordered briefing. All

briefs have now been submitted and the matter is ripe for determination. For the reasons set forth below, Debtors' jointly administered subchapter V Plan dated August 21, 2020 is confirmed pursuant to 11 U.S.C. § 1191(b).

## I.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to contested matters pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is an inconsistency, this Memorandum Opinion controls.

### A. Procedural History

On March 3, 2020, Pearl Resources LLC ("*Pearl Resources*") and Pearl Resources Operating Co. LLC ("*Pearl Operating*") (each a "*Debtor*"; collectively "*Debtors*") each filed their separate Chapter 11 petitions under Title 11, Chapter 11, subchapter V of the United States Bankruptcy Code.[1] On March 10, 2020, the Court granted Debtors' motion to jointly administer the two cases.[2] On April 13, 2020, a status conference concerning the jointly administered Debtors was held at which time the Court entered an order which provisioned, inter alia, that a plan of reorganization be filed no later than June 1, 2020.[3] On April 14, 2020, the First Meeting of Creditors was held, both Debtors appeared, by and through its managing member Dr. Dria,

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.
[2] ECF No. 27.
[3] ECF No. 85.

and the meeting was concluded.[4]  By order of the Court, the bar date for non-governmental interests and proofs of claim in these cases was May 1, 2020.[5]  On May 22, 2020, Debtors filed an emergency motion to extend the time to file a plan.[6]  On May 28, 2020, the Court held a hearing on the emergency motion and after considering the pleadings on file and evidence taken at the hearing, the motion was granted providing Debtors until July 1, 2020, to file a plan of reorganization.[7]

On July 1, 2020, Debtors timely filed their subchapter V plan of reorganization.[8]  On July 2, 2020, the Court (i) fixed the time for filing acceptances or rejections of the Plan; (ii) fixed the time for filing objections to confirmation of the Plan; and (iii) scheduled a hearing to consider confirmation of the Plan for August 13, 2020.[9]  On July 8, 2020, Debtors served on all creditors, parties-in-interest, and others requesting notice, the Plan Solicitation Package that included: (i) the Debtors' plan;[10] (ii) the Court's Order fixing deadlines for voting and objections; and (iii) the approved Ballot for Accepting or Rejecting Debtors' Plan.[11]

On August 6, 2020, the following creditors timely filed their objections to confirmation of Debtors' Plan: Pilot Thomas Logistics, LLC ("*Pilot Thomas*");[12]  TransCon Capital, LLC ("*TransCon*");[13]  Nabors Drilling Technologies USA, Inc. ("*Nabors*");[14] and Terrell CAD, Harris County, Pecos County ("*Terrell CAD*").[15]  The Terrell CAD objection was subsequently withdrawn, leaving only Pilot Thomas, TransCon, and Nabors (collectively "*Objecting*

---

[4] Min. Entry (04/14/2020).
[5] ECF No. 47.
[6] ECF No. 122.
[7] ECF No. 133.
[8] ECF No. 179.
[9] ECF No. 182.
[10] ECF No. 179.
[11] ECF No. 182.
[12] ECF No. 205.
[13] ECF No. 206.
[14] ECF No. 208.
[15] ECF No. 209.

*Creditors*").  On August 10, 2020, Debtors filed Docket No. 210 evidencing the ballot tabulation in which four Classes of claims held by non-insiders (three of which are impaired) voted to accept the Plan and three impaired Classes of claims held by non-insiders voted not to accept the Plan.[16]  Thereafter, on August 12, 2020, Debtors uploaded a proposed order confirming Debtors' plan that included language purporting to modify language contained in the plan as it pertained to treatment of the Objecting Creditors' claims.[17]  However, pursuant to the Court's order at the August 13, 2020 hearing, Debtors filed a modified plan on August 21, 2020, which is currently the live pleading before the Court ("*Plan*").[18]

## II.   CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and the Court's Constitutional Authority to Enter a Final Order

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and now exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[19]  Confirmation of a plan of reorganization constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (L).  Therefore, the Court holds constitutional authority to enter a final order and judgment.[20]  Finally, venue is governed by 28 U.S.C. §§ 1408, 1409.  Venue is proper because Debtors' principal place of business has been in the Southern District of Texas for the 180 days immediately preceding the Petition Date.  The Court will next turn its attention to the statutorily required contents of a subchapter V plan of reorganization.

### B.  Requisite Contents of a Subchapter V Plan of Reorganization

Section 1125 of the Bankruptcy Code normally requires a disclosure statement that

---

[16] ECF No. 210.

[17] ECF No. 216.

[18] ECF No. 226; ECF No. 224 is a redlined version of the modified plan which was timely filed. ECF No. 226 is a clean version of the same modified plan, which the Court will treat as the modified plan.

[19] *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).

[20] *See Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015); *Stern v. Marshall*, 564 U.S. 462 (2011).

provides adequate information regarding the debtor's plan of reorganization and implementation of the plan of reorganization.[21]   However, subchapter V includes several features designed to facilitate the efficient and economical administration of the case and the prompt confirmation of a plan. These features include elimination of, inter alia, a separate disclosure statement unless the court orders otherwise.[22]

Although no disclosure statement is required, the subchapter V plan must, at a minimum, contain the following: (a) a brief history of the subchapter V debtor's business operations;[23] (b) a liquidation analysis;[24] (c) projections with respect to the ability of the subchapter V debtor to make payments under the proposed plan;[25] (d) the submission of all or a portion of the subchapter V debtor's post-petition income from future earnings or (other future income) to the supervision and control of the trustee "as is necessary for the execution of the plan";[26] and (e) in a nonconsensual subchapter V plan, such as the case here, appropriate remedies that may include liquidation of nonexempt assets to protect the holders of claims or interests in the event plan payments are not made.[27]   Apart from the mandatory provisions, a subchapter V debtor's plan may contain any additional provisions that are consistent with the Bankruptcy Code but which are not applicable in the instant case.[28]   The Court will take each one in turn.

## 1.  Debtors' Plan of Reorganization

### a.  History of Debtors' Business Operations

---

[21] 11 U.S.C. § 1125.
[22] 11 U.S.C. § 1187(C).
[23] 11 U.S.C. § 1190(1)(A).
[24] 11 USC § 1190(1)(B).
[25] 11 USC § 1190(1)(C).
[26] 11 USC § 1190(2).
[27] 11 USC § 1191(c)(3)(A).
[28] *See e.g.* 11 USC § 1190(3) (a new provision promulgated by the statute which provides for  modification of the rights of a holder of a claim secured only by a security interest in real property that is the principal residence of the debtor if the new value received in connection with the granting of the security interest was not used primarily to acquire the real property, but was used primarily in connection with the small business of the debtor).

Section 1190(1)(A) requires that a debtor include in its plan "a brief history of the business operations of the debtor." Here, Debtors included the following business history in their Plan filed on August 21, 2020.[29] Debtors are Texas limited liability companies with their corporate offices in Houston, Texas. Debtors have outsourced to third parties all of the operational aspects of their business, except for their finance and administrative functions. Myra A. Dria ("*Dr. Dria*") manages Debtors' finances, administrative functions, and directs operations of their third-party contractors. The primary asset of Debtors are oil and gas leases located in Pecos County, Texas. Dr. Dria is the founder and Managing Member of Pearl Resources and through Pearl Resources, the Managing Member of Pearl Operating. Dr. Dria graduated from the University of Texas with a Ph.D. in Petroleum Engineering with Honors in 1988.

Debtors have under lease 2,240 acres in Pecos County, Texas. In addition, Debtors are in a dispute concerning an additional 320 acres located in the south half of Section 22. Adjacent operators are Jagged Peak Energy Inc. and Parsley Energy LLC, both publicly owned entities. Debtors' primary business has been to develop, design and build infrastructure to support drilling operations, and drill and manage new oil and gas wells with production batteries on their lease acreage in Pecos County. Debtors also operate two wells located in Pecos County: Brandenburg Well No.1 and the Garnet State No. 3.

---

[29] ECF No. 226 at 2–18.

###### i.     Description of Debtors' Main Assets

The Garnet State Lease legal description/location is H&GN RR Survey, Pecos County Block 8 Section S/2 20 (320 acres) and Debtors hold this S/2 of Section 20 under a Relinquishment Lease with the State of Texas for the development of the oil and gas interests. Debtors also believe they are entitled to hold the S/2 of Section 22 (320 acres) also under that same Relinquishment Lease but this acreage is under dispute with the Texas General Land Office.

There is one Phantom (Wolfcamp) field oil and gas well, the Garnet State #3, which was drilled vertically to 11,000 ft. in 2017 and completed with a one stage hydraulic frack.  Although the well has an installed pumping unit (American 456-320-120, 3 25 KVA transformer and 50 hp electric motor) with controller and new rods awaiting installation the well, according to Debtors, is currently producing naturally, flowing, under natural gas pressure.

A production battery for Garnet State Lease exists on Section 20 with two 300 bbl production tanks, catwalks, and new vertical gun barrel tank.  A meter run with a total flow gauge was installed and upgraded.  One separator exists at the well, and another separator exists at the battery flare to optimize liquid recovery from the gas stream.[30]  A 4-acre pad was built for the first smaller battery, and an 8-acre pad was built for the battery expansion for the  horizontal well production and gas treatment facilities.  The battery extension is where the flare is located for safety purposes.

For drilling and completion purposes, two water wells at either end of the S/2 of Section 20 lease were drilled and outfitted with downhole water well pumps and three (3) owned 45 KW portable Magnum Diesel Generators.  Both water wells produce freshwater at 200+ GPM.  There are three plastic-lined permanent frack pits and one unlined mega frack pit capable of holding an

---

[30] *See* Case 20-31585 ECF No. 54 on Schedule 46 for full equipment listing – "the *Garnet State Lease Equipment*".

additional 1.5 MM bbls of fresh water.  Located at the north end of the S/2 of Section 20 two storage connex buildings are located for equipment storage.  Additional casing and equipment are also stored at this location.  Power poles and wire are installed extending the length of the section.

The South half of Section 22, a 320-acre tract under the State Lease (in dispute), holds an owned water well equipped with downhole pump capable of delivering 200+ bbls of freshwater per day.  Another generator is placed at this location together with a 40,000 bbl freshwater lined frack pit.  A third horizontal well, 5000 ft. lateral, is permitted and was drilled to 2000 ft. with surface case set and cemented to this depth.  The well pad and lined reserve pit have been built, together with rat hole, cellar, and 2000 ft. of cemented 13 3/8" J55 casing.  Intentions are to continue to drill the well to 10,000 ft. and add a 5,000 ft. lateral to this well.  A 5-acre auxiliary battery pad has been built which would offer initial gas, oil, and water separation before transport across Section 21 easement to final processing on section 20 for delivery to pipelines.  A 72-acre development area has been fenced in with an 8-ft. game fence and two 30-ft. cantilevered gates.  A six well 10-acre drilling pad has also been built on the southeast corner of the section.  A 100-ft. wide half-mile pipeline, power, and road easement extends between Section 20 across Section 21 to Section 22.

The Brandenburg Lease legal description is H&GN RR Survey, Pecos County Block 8 Section 40:E/2 containing 320 acres more or less;  H&GN Railway Company Survey, Block 8, Section 41: W/2, Pecos County, Texas and containing 320 acres more or less; H&GN Railway Company Survey, Block 8, Section 42: All, Pecos County, Texas and containing 640 acres more or less; H&GN Railway Company Survey, Block 8, Section 44: All, Pecos County, Texas and containing 640 acres more or less; comprising a total of 1,920 acres, more or less.

These are more or less adjacent sections with a majority of common mineral ownership across several hundred mineral owners. The depths of the position were severed to some extent when the Yates interval at 2600 ft. was first exploited in the 1930's and the original family ownership started selling portions of the other depths. The Yates was developed on large spacing so remaining infill locations remain as "Proven," but Debtors leased the interests of all of the original family members and subsequently added other interests which delivered a majority interest in all depths to Debtors. The ownership is extremely complicated, with many owners and transfers back and forth between various individuals and selling other interests in a royalty trust making this leasehold title work extremely challenging and an expensive endeavor to decipher and obtain.

Subsequent to the Yates development was the Cherry Canyon at 5,000 ft. and the Ellenburger at 20,000 ft. depth. In 1979, AG Hill drilled the Brandenburg #1 well on Section 44 to the Ellenburger. The well was poorly tested and completed, with final testing and production occurring from the Fusselman followed by an Atoka completion. Production facilities were never installed, and gas produced from these deep horizons were sent directly to pipeline. Debtors acquired new leases when the well had been abandoned and non-producing for over 6 years and the well was part of the leasehold.

### ii.    Statutory Mineral Property Liens

In October 2016, a wild well incident occurred during the drilling of the Garnet State #4 well by PDS Drilling, LLC ("*PDS*") pursuant to a Turnkey Drilling Contract with Debtor, Pearl Operating (the "*Turnkey Contract*"). Under the Turnkey Contract, Debtor Pearl Operating required PDS to provide its services on a fully turnkey basis which meant PDS was responsible to furnish equipment, labor, and perform services as described in the contract for a total specified

sum.  After the wild well incident, PDS failed to pay amounts due to numerous subcontractors. Many of these subcontractors asserted various claims against Debtors in an effort to hold them responsible for PDS's obligations.  Additionally, many of these claimants filed statutory mineral property liens against Debtors' oil and gas properties and sued Debtors to foreclose those liens.

### iii.    Texas General Land Office ("*GLO*") Issues and Status

State Lease M-113155 (the "*State Lease*") consists of dozens of undivided interest leases obtained under the Relinquishment Act that covers all of Section 20, Blk. 8, H&GN Ry Co. Survey, A-5206 and the S/2 of Section 22, Blk. 8, H&GN Ry Co. Survey, A-5208.  Many of the earliest undivided interest leases were dated in September and October of 2011 and had primary terms of 5 years.  Debtors acquired those leases in late 2012.  Additional leases were taken in 2014 with 5-year primary terms, and then others were taken in 2016 with one-year primary terms.  The two sections covered by the State Lease are not contiguous, and neither section had access to a public road.  The nearest public road to Section 20 is FM 1776, about 1.5 miles to the west.  The nearest public roads to Section 22 are FM 1450, about 4 miles to the south, and FM 1776, about 2.5 miles to the west.  In early 2013, Debtors contracted with Total Field Services to construct a road across Section 44 into Section 22.   However, due to some delay as more fully described in Debtors' Plan of reorganization, access to Section 20 has been delayed.

The Court finds that Debtors' Plan provides more than an adequate history of Debtors' business operations and therefore satisfies § 1190(1)(A).[31]

---

[31] ECF No. 226 at 2–18.

### b.  Liquidation Analysis

Section 1190(1)(B) requires that a debtor include a liquidation analysis in its plan of reorganization.[32]  Here, Debtors' plan of reorganization states that "[t]he total amount of unpaid and unresolved non-insider claims asserted against Debtors is approximately $1,200,000."[33]  Dr. Dria's uncontroverted testimony was that the Wolfcamp development on S/2 of Section 20 has a NPV10 value of $22,420,000, the Garnet State Mineral Leasehold – Undeveloped, Proven, Acreage is valued at $35,390,000, the Garnet State Lease Collateral[34] is valued at $7,440,000; the Brandenburg Mineral Leasehold – Undeveloped, Proven, Acreage is valued at $13,602,648 and the Brandenburg Leasehold, Undeveloped, Proven, Acreage is valued at $50,782,770.[35] Even including Dr. Dria's DIP Loan, the value of Debtors' assets far exceed the total amount of claims that would be required to be paid if Debtors were liquidated.[36]  Exhibit C attached to Debtors' Plan provides a more detailed presentation of the value of Debtors' assets.[37] The Plan provides for full and complete satisfaction of all allowed claims with interest. The Court, therefore, finds that Debtors' liquidation analysis satisfies § 1190(1)(B).

### c.  Financial Projections

Section 1190(1)(C) requires that a debtor's plan contain "projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization."[38]  As demonstrated by Debtors' Exhibit D attached to their Plan, Debtors project that for the execution of a nominally 5,000 foot lateral, with appropriate expenses, taxes, and a $4 million capital

---

[32] 11 U.S.C. § 1190(1)(B).

[33] ECF No. 226-2.

[34] As stated by Debtors, "Garnet State Lease Collateral" includes 160 acres on the east side of the south half of Section 20 (out of the 320 acres not in dispute with the Texas General Land Office) and the four (4) wells and equipment located on such 160 east side acres.

[35] Min. Entry (8/13/2020); *See* ECF No. 226-3.

[36] ECF No. 226-2.

[37] ECF No. 226-3, Ex. C.

[38] 11 U.S.C. § 1190(1)(C).

investment for drilling and completion, this well can generate a reasonable return at July 2020 WTI/HH strip prices which range within the $39 – $49 per barrel of oil range through 2028 and for this rich gas (1130 – 1280 mmbtu/mcf) a price which averages $2.50/mcf, yields a net cash flow of approximately $150,000 per month. [39] Debtors believe that the financial projections can be achieved if the 160 acres on the west half of the south half of Section 20 are freed from any lien claims. Debtors further project that by September 2022, Debtors can generate as much as $5 million in oil and gas revenues. Alternatively, if Debtors are unable to successfully drill a well within a reasonable time period after confirmation, Debtors will sell an approximate 20 percent working interest in the Garnet State Lease Collateral to raise sufficient capital to pay all allowed claims in full ("*Allowed Claim(s)*").[40]

Debtors' performance under this Plan is not dependent upon the generation of disposable income ("*Disposable Income*") to pay Allowed Claims because Debtors are committing to sell assets sufficient to pay Allowed Claims in full if they are not successful in paying Allowed Claims in full from Disposable Income within two (2) years.[41] Nevertheless, Debtors' financial projections demonstrate that there is a reasonable likelihood that Debtors will have projected Disposable Income for the period described in § 1191(c)(2) sufficient to pay all Allowed Claims in full, with interest. Accordingly, the Court finds that Debtors' financial projections satisfy § 1190(1)(C).

### d. Submission of All or a Portion of the Subchapter V Debtors' Post-Petition Income to the Supervision and Control of the Trustee

Section 1190(2) requires the plan to provide for the submission of "all or such portion of the future earnings or other future income of the debtor to the supervision and control of the

---

[39] ECF No. 226, Ex. D.
[40] *Id.*
[41] ECF No. 226.

trustee as is necessary for the execution of the plan."[42]   In an individual case, this provision replaces the similar rule in § 1123(a)(8).   In non-individual cases, as in the case sub judice, it imposes a new requirement.   Because a plan ordinarily must provide for payment of creditors from the debtor's income, the requirement for the submission to the trustee of income as necessary for the execution of the plan constitutes a feasibility prerequisite.   Moreover, § 1183(c)(1) provides for termination of the trustee's service upon substantial consummation of a consensual plan under § 1191(a). Under § 1101(2), "substantial consummation" occurs upon, inter alia, "commencement of distribution under the plan."

Conversely, in a non-consensual plan such as the one before the Court, § 1194(b) provides for the subchapter V trustee to make payments to creditors under the plan, after confirmation, unless the plan or the order confirming it provides otherwise.[43]   Because the subchapter V trustee must make payments under a non-consensual plan, the trustee's service does not terminate upon its substantial consummation but continues, at a minimum, until the trustee has made the required disbursements.   Although Debtors' original Plan contemplated Debtors making payments to creditors, the Court, given the objections raised by creditors discussed more fully infra, found it appropriate to require Debtors to submit all or such portion of the future earnings or other future income of Debtors to the supervision and control of the subchapter V trustee as is necessary for the execution of the plan.[44]

Section 5.06 of Debtors' modified Plan provisions, inter alia, for Drew McManigle ("*SBRA Trustee*") to act as the Plan disbursing agent.[45]   It further provides for Debtors to remit quarterly all Disposable Income generated by Debtors for the previous quarter to the SBRA

---

[42] 11 U.S.C. § 1190(2).
[43] 11 U.S.C. § 1194(b).
[44] 11 U.S.C. § 1190(2).
[45] ECF No. 226 at 30.

Trustee, along with an accounting of how Debtors calculated Disposable Income.[46]  Section 5.06

then directs the SBRA Trustee to pay the Allowed Claims under Classes 2, 4, 5, 6, 7, and 8 from

Disposable Income until such time as Allowed Claims under 2, 4, 5, 6, 7, and 8 are paid in full.[47]

Accordingly, the Court finds that Debtors' Plan meets the requirements of § 1190(2).

### e.   Default and Remedies After Confirmation

Because the provisions of a confirmed plan are binding on the debtor and creditors under

§ 1141(a), the plan's provisions for default and remedies control.  In a consensual plan, the

provisions governing default and remedies ordinarily have their source in negotiations with the

various creditors that lead to terms that result in acceptance of the plan.  When one or more

classes of impaired creditors do not accept the plan, such as the case here, the requirements for

nonconsensual plan confirmation in § 1191(c) provide the source of remedies for default which

may include liquidation of nonexempt assets to protect the holders of claims or interests in the

event plan payments are not made.[48]  The only explicitly named remedy in § 1191(c)(3)(B) is

"the liquidation of nonexempt assets," which must be evaluated in this case.[49]

As discussed more fully infra, Debtors have objected to the claims of the following

classes of secured creditors: Class 4 –Nabors in the amount of $745,209.45; Class 5 – Pilot

Thomas in the amount of $95,749.17; Class 6 – Maverick Oil Tools, Inc. ("*Maverick*") in the

amount of $133,635.28; Class 7 – TransCon in the amount of $90,223.87; and Class 8 – Charger

Services, LLC ("*Charger*") in the amount of $86,470.02, for a combined $1,151,287.79 in

disputed claims.[50]

In their Plan, Debtors proclaim that by leaving the west 160 acres of the south ½ of

---

[46] *Id.*
[47] *Id.*
[48] 11 U.S.C. § 1191(c)(3)(B).
[49] *Id.*
[50] ECF Nos. 116–120.

Section 20 unencumbered, it will increase significantly the opportunity to attract a drilling partner, which in turn will help facilitate the payment of Allowed Claims in Classes 4, 5, 6, 7, and 8.[51]   This requires that the Objecting Creditors' liens on this west 160 acres be released, which forms the basis of their objections.   The Objecting Creditors' claims, however, are disputed and subject to final resolution by this Court in the pending adversary complaints.[52]

First, Nabors's claim is the subject of an adversary proceeding case number 20-3125 in which Debtors allege, inter alia, that Nabors overbilled and breached its contract with Debtors on a drilling projected located on the Garnet State Lease and Debtors contest the validity of Nabors's mineral property lien filed of record in Pecos County Texas.   Second, Pilot Thomas is the subject of an adversary proceeding filed by Debtors in case number 20-3077.   In that case, Debtors allege that Pilot Thomas's claim is not the obligation of Debtors, but rather of PDS, whom Debtors hired to bring under control a wild well in 2016.   As part of the wild well project, Debtors allege,  PDS contracted with and was obligated to pay Pilot Thomas as its subcontractor. Third, TransCon's claim is the subject of an objection filed by Debtors in which Debtors raise similar complaints to that of the Pilot Thomas claim, in that the TransCon claim is not the obligation of Debtors but the same third-party contractor, PDS, hired by Debtors to bring under control a wild well in 2016. [53]   As part of the wild well project, Debtors allege, PDS also contracted with and was obligated to pay TransCon as its subcontractor.   For each of the disputed claims, the Plan provides that:

1.  upon confirmation of the Plan, [Disputed Creditor's] Pre-Petition Lien shall be released except as to the Garnet State Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas.

---

[51] ECF No. 226.
[52] *See* ECF Nos. 81, 105, 132.
[53] ECF No. 120.

2. to the extent of the amount of [Disputed Creditor's] Allowed Claim, [Disputed Creditor] shall be entitled to retain its lien and security interest in the Garnet State Lease Collateral ("Disputed Creditor's Retained Lien").

3. if the [Disputed] claim is not allowed. [Disputed Claimant's] Retained Lien in the Garnet State Lease Collateral shall be released and within ten *(*10) days of the Court's order, [Disputed Claimant] shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

4. [Disputed Claimant's] Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. The [Disputed Claimant's] Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 5, 6, 7 and/or 8. On a quarterly basis until paid in full, [Disputed Claimant's] Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 5, 6, 7, and/or 8) of Disposable Income from and after the Effective Date ("*Effective Date*")[54] subject to Section 5.03 of the Plan.

5. the [Disputed] Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "[Disputed] Payment Deadline"). If the Debtors fail to pay the [Disputed] Allowed Claim on or before the [Disputed] Payment Deadline, the Debtors will be required to sell sufficient Garnet State Lease Collateral to pay the [Disputed] Allowed Claim in full. If the Debtors fail to pay the [Disputed] Allowed Claim in full on or before one year from the [Disputed] Payment Deadline, [Disputed Claimant] shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of [Disputed Claimant's] Allowed Claim, [Disputed Claimant] shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Additionally, Section 7.06 of Debtors' Plan titled "Retained Collateral & Extra Protection" provides that Classes 4, 5, 6, 7, and 8 retain their pre-petition liens in the Garnet State Lease Collateral to the extent of the amounts of their Allowed Claims, if any.[55] Debtors value the Garnet State Lease Collateral at $7,440,000.[56] The total amount of the claims filed by holders of claims in Classes 4, 5, 6, 7, and 8 is approximately $1,151,287 in the aggregate which translates to approximately a 6 to 1 collateral to debt ratio. As further protection of the Allowed Claims in

---

[54] The defined term "Effective Date" shall have the meaning set forth in Debtor's Plan at ECF No. 226.
[55] ECF No. 226 at 33.
[56] *Id.*

Classes 4, 5, 6, 7, and 8, Debtors agree that should any Allowed Claim remain unpaid as of the 34th month after the Effective Date, Debtors will at such time grant any unpaid Allowed Claims in Classes 4, 5, 6, 7, and/or 8 a lien in Debtors' interest at the time in the west 160 acres of the south half of Section 20 to secure Debtors' obligation to pay any such Allowed Claim in full on or before the 36th month anniversary of the Effective Date.[57]

Accordingly, the Court finds that the Plan meets the requirements of § 1191(c)(3)(B) because it details remedies necessary to protect claim holders if Plan payments are not made, including the liquidation of Debtors' nonexempt assets.

Now that the Court has determined that Debtors' Plan meets the requisite requirements of a subchapter V plan under § 1190, the Court must address whether Debtors' Plan may be confirmed in light of creditors' objections to the Plan.[58]

### C.  Whether Debtors' Plan Should be Confirmed Considering Creditors' Objections

#### 1.  Classification and Treatment of Claims

Debtors' Plan provides for two classes of priority claims (classes 1 and 2); eight classes of secured claims (classes 3–10); two classes of non-priority unsecured clams (classes 11 and 12); one class of pre-petition insider unsecured claims (class 13); and one class of equity security holders (class 14) as follows:

Class 1: All allowed claims entitled to priority under § 507(a) of the Code.

Class 2: The post-petition debtor-in-possession loan made by Dr. Dria to Debtors.

Class 3: The agreed Allowed Claim of Allied OFS LLC ("*Allied*").

Class 4: The claim of Nabors to the extent allowed.

Class 5: The claim of Pilot Thomas to the extent allowed.

---

[57] *Id.*
[58] ECF Nos. 205–208.

Class 6: The claim of Maverick to the extent allowed.

Class 7: The claim of TransCon to the extent allowed.

Class 8: The claim of Charger to the extent allowed.

Class 9: The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by Von Directional Services, LLC ("Von *Directional*") and any related claim against either of Debtors.

Class 10: The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by RH Trucking, LLC (and Ricardo & Adelaida Huitron) and any related claim against either of Debtors.

Class 11: All non-priority unsecured claims under § 502 of the Code.

Class 12: Potential creditors listed in Debtors' schedules as disputed, but who did not file a proof of claim on or before the bar date of May 1, 2020.

Class 13: Pre-petition loans made by Dr. Dria to Debtors.

Class 14: The Equity Interests of Dr. Dria in Pearl Resources, and Pearl Resources in Pearl Operating.

## 2.  Votes, Objections, and Resolutions

The Plan separates claims and equity interests into 14 classes, 11 of which are impaired.[59]

Classes 2, 13, and 14 are claims and interests held by insiders and those Classes voted to accept the

Plan.[60]  There are no claims asserted under Classes 1, 11, and 12 and no votes were cast by

members of those classes.[61]   Class 10 did not submit a ballot.[62]   Classes 3, 6, 8, and 9 voted to

accept the Plan.[63]  Classes 4, 5, and 7 voted against the Plan.[64]

Debtors lodged objections to the claims of members of Classes 4, 5, and 7 and such

---

[59] ECF No. 226
[60] ECF No. 210.
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*

objections remain pending.[65]  Class 4, 5, and 7 filed objections to the Plan arguing, inter alia, that the Plan does not provide the holders of claims in Classes 4, 5, and 7 the realization of the indubitable equivalent of their respective claims.  The objection to the Plan filed by Harris County, Pecos County, and Terrell's CAD has been withdrawn in exchange for Debtors' agreement to treat the claims of such taxing authorities as provided in the Plan.

### 3. Confirmation of Debtors' Jointly Administered Subchapter V Plan of Reorganization

In a non-subchapter V case, the court must confirm a Chapter 11 plan if all the requirements of § 1129(a) are met.[66]  Additionally, when all of the requirements of § 1129(a) are met, except the requirement in paragraph (a)(8) requiring that all impaired classes accept the plan, § 1129(b)(1) permits "cramdown" confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with regard to each impaired class that has not accepted it.[67]  Finally, § 1129(b)(2) states the rules for the "fair and equitable" requirement for classes of secured claims, unsecured claims, and interests.[68]  The effects of confirmation are the same even if cramdown confirmation occurs under § 1129(b).

Pursuant to § 101(51D), however, Debtors are small business debtors and subchapter V of Chapter 11 applies to Debtors in these jointly administered bankruptcy cases.[69]  The Court already found that the Plan adequately provides the information required by § 1190(1).  Section 1191 states the rules for confirmation in a subchapter V case.[70]  The starting point is that § 1129(b) does not apply.[71]  Section 1129(a), however, remains applicable in a subchapter V case

---

[65] *See* ECF No. 115–120.
[66] 11 U.S.C. § 1129(a).
[67] 11 U.S.C. § 1129(b)(1).
[68] 11 U.S.C. § 1129(b)(2).
[69] *See also* ECF No. 32.
[70] 11 U.S.C. § 1191.
[71] 11 U.S.C § 1181(a).

except for paragraph (a)(15), which imposes a projected disposable income requirement in the case of an individual, if an unsecured creditor invokes it.[72]  If all the applicable requirements in § 1129(a) are met, except for the projected disposable income rule of paragraph (a)(15), § 1191(a) requires the court to confirm the plan.[73]  Because § 1129(a)(8) requires acceptance of the plan by all impaired classes, confirmation under § 1191(a) can occur only if all impaired classes have accepted it.[74]  This, of course, is more colloquially referred to as a consensual plan.

Where the subchapter V debtor cannot obtain full consent for the plan (i.e. one or more impaired classes of claims or interests rejects the plan), § 1191(b) sets forth the rules for cramdown and replaces the requirements of § 1129(b), which do not apply in a subchapter V case.[75]  Instead, under § 1191(b), the court shall confirm a subchapter V plan that satisfies the confirmation requirements, other than the requirements of  § 1129(a)(8) (providing that all classes vote to accept the plan or not be impaired by the plan), § 1129(a)(10) (requiring at least one impaired class to accept the plan), and  § 1129(a)(15) (requiring payment of unsecured creditors in full or devoting allocated projected disposable income to the plan), so long as the plan does not discriminate unfairly against any impaired, non-consenting class and is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.[76]  As such, the Court must first determine whether, other than paragraphs 8, 10, and 15 of § 1129(a), the requirements of § 1129(a) have been met.  The Court will review each one in turn.

    **a.  Requirements of § 1129(a)**

        **i.  Section 1129(a)(1)**

---

[72] *Id.*
[73] 11 U.S.C. § 1191(a).
[74] *Id.*
[75] 11 U.S.C. § 1181(a).
[76] 11 USC § 1191(b).

The first requirement of § 1129(a) is that the plan must comply with "the applicable provisions of this title."[77]  The legislative history reflects that "the applicable provisions of chapter 11 include such sections as 1122 and 1123, governing classification and contents of a plan."[78]  Debtors' Plan sets forth the following claims and interests:

Class 1 – All allowed claims entitled to priority under § 507(a) of the Code.  Priority claims are unimpaired. No claims entitled to priority under § 507(a) of the Code have been filed or asserted.

Class 2 – The post-petition debtor-in-possession loan made by Dria to the Debtors.  Myra Dria has made a debtor-in-possession loan (the "*DIP Loan*") to the Debtors pursuant to the Court's order (the "*DIP Loan Order*") dated March 31, 2020.[79]  Dr. Dria committed up to $500,000 under the DIP Loan.  Pursuant to the DIP Loan Order, Dr. Dria was granted super priority administrative expense status under § 364(c)(1) of the Code and the DIP Loan is entitled to the protections of § 364(e) of the Code. As of the date of this Memorandum Opinion, the amount due and owing under the DIP Loan is approximately $252,000.  On a quarterly basis until such time as Allowed Claims under Classes 4, 5, 6, 7, and/or 8 are paid in full, Class 2 shall be paid its pro-rata share (with the Allowed Claims under Classes 4, 5, 6, 7 and/or 8) of Disposable Income from and after the Effective Date.

Class 3 – The agreed Allowed Claim of Allied OFS LLC ("*Allied*").  The Debtors and Allied have reached a settlement with respect to Allied's claim against both Debtors in the amount of $3,346,349.53. Allied voted in favor of the Plan. Allied's Allowed Claim is $150,000 and shall be paid as follows: (i) $100,000 on the Effective Date; and (ii) $50,000 on or before nine (9) months from the date of this Order. Allied shall release the statutory mineral property lien it filed pre-petition against the Debtors' properties in Pecos County, Texas, within ten (10) days of its receipt of $100,000. Debtors shall supply Allied with the appropriate form of release.

The Plan provides for a joint and mutual release between the Debtors and Allied in which Allied shall be released by the Debtors and their bankruptcy estates, and the Debtors and their bankruptcy estates shall be released by Allied, from any and all claims, obligations, debts, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their bankruptcy estates, on the one hand, and Allied, on the other hand, have asserted or could have asserted, based on or relating to, or in any manner arising from, in whole or in part, the claims asserted in any litigation prior to the confirmation of this Plan, the Debtor's business dealings with Allied, and/or

---

[77] 11 U.S.C. § 1129(a)(1).
[78]  H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6368, 5787, 5912.
[79] ECF No. 72.

the pre-petition mineral lien recorded by Allied, and any matters related to the foregoing; provided however, such release does not include any of the Debtors' obligations to Allied under this Plan.

Entry of this Court's Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the release of Allied's claims against the Debtors and the bankruptcy estates and the reciprocal release of the Debtors and the bankruptcy estates against Allied, and further, shall constitute the Court's finding that the joint and mutual releases of the Debtors and the bankruptcy estates, on one hand, and Allied, on the other hand, is (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise, (c) in the best interests of the Debtors and their estates, (d) fair, equitable, and reasonable, (e) given and made after due notice and opportunity for hearing, and (f) a bar to the Debtors and the bankruptcy estates asserting any claims or causes of action released herein and a bar to Allied asserting any claims or causes of action released herein.

Class 4 – The claim of Nabors to the extent allowed.  The claim filed by Nabors is disputed. Nabors voted to reject the Plan. Prior to the bankruptcy filing, Nabors filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("*Nabors' Pre-Petition Lien*"). The Plan provides for Nabors' Pre-Petition Lien to be released except as to the Garnet State Lease Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County. The form of such release will be provided by the Debtors. The Plan further provides that to the extent of the amount of Nabors' Allowed Claim, Nabors shall be entitled to retain its lien and security interest in the Garnet State Lease Collateral ("*Nabors' Retained Lien*"). If the Nabors' claim is not allowed, Nabors' Retained Lien in the Garnet State Lease Collateral shall be released, and within ten (10) days of the Court's order, Nabors shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Nabors' Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. The Nabors' Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 5, 6, 7 and/or 8. On a quarterly basis until paid in full, Nabors' Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 5, 6, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. Nabors' Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "Nabors Payment Deadline"). If the Debtors fail to pay Nabors' Allowed Claim on or before the Nabors Payment Deadline, the Debtors are required to sell sufficient Garnet State Lease Collateral to pay Nabors' Allowed Claim in full. If the Debtors fail to pay the Nabors' Allowed Claim in full on or before one year from the Nabors Payment Deadline, Nabors shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of Nabors' Allowed Claim, Nabors shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained

Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 5 – The claim of Pilot Thomas to the extent allowed. The claim filed by Pilot Thomas is disputed. Pilot Thomas voted to reject the Plan. Prior to the bankruptcy filing, Pilot Thomas filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("*Pilot's Pre-Petition Lien*"). The Plan provides for Pilot Thomas's Pre-Petition Lien to be released except as to the Garnet State Lease Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas. The form of such release shall be provided by the Debtors. To the extent of the amount of Pilot Thomas's Allowed Claim, Pilot Thomas shall be entitled to retain its lien and security interest in the Garnet State Lease Collateral ("*Pilot's Retained Lien*"). If Pilot Thomas's claim is not allowed, Pilot Thomas's Retained Lien in the Garnet State Lease Collateral shall be released, and within ten (10) days of the Court's order, Pilot Thomas shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Pilot Thomas's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. Pilot Thomas's Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 6, 7, and/or 8. On a quarterly basis until paid in full, Pilot Thomas's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 4, 6, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. Pilot's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "*Pilot Payment Deadline*"). If the Debtors fail to pay Pilot Thomas's Allowed Claim on or before the Pilot Payment Deadline, the Debtors are required to sell sufficient Garnet State Lease Collateral to pay Pilot Thomas's Allowed Claim in full. If the Debtors fail to pay Pilot Thomas's Allowed Claim in full on or before one year from the Pilot Payment Deadline, Pilot Thomas shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of Pilot's Allowed Claim, Pilot Thomas shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 6 – The claim of Maverick to the extent allowed. The claim filed by Maverick is disputed. Maverick voted to accept the Plan. Prior to the bankruptcy filing, Maverick filed a statutory mineral property lien under Texas law that attached to certain of the Debtors' assets ("*Maverick's Pre-Petition Lien*"). The Plan provides for Maverick's Pre-Petition Lien to be released except as to the Garnet State Lease Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas. The form of such release shall be provided by the Debtors. To the extent of the amount of Maverick's Allowed Claim, Maverick shall be entitled to retain its lien and security interest in the Garnet State Lease Collateral ("*Maverick's Retained Lien*"). If Maverick's claim is not allowed, Maverick's Retained Lien in the

Garnet State Lease Collateral shall be released, and within ten (10) days of the Court's order, Maverick shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.   Maverick's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. Maverick's Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 7, and/or 8. On a quarterly basis until paid in full, Maverick's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Class 4, 5, 7, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. Maverick's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "*Maverick Payment Deadline*"). If the Debtors fail to pay Maverick's Allowed Claim on or before the Maverick Payment Deadline, the Debtors are required to sell sufficient Garnet State Lease Collateral to pay Maverick's Allowed Claim in full. If the Debtors fail to pay Maverick's Allowed Claim in full on or before one year from the Maverick Payment Deadline, Maverick shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of Maverick's Allowed Claim, Maverick shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 7 – The claim of TransCon the extent allowed.  The claim filed by TransCon is disputed. TransCon voted to reject the Plan. Prior to the bankruptcy filing, TransCon filed a statutory mineral property lien under Texas law and a statutory judgment lien that attached to certain of the Debtors' assets ("*TransCon's Pre-Petition Lien*"). The Plan provides for TransCon's Pre-Petition Lien to be released except as to the Garnet State Lease Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos and Harris Counties, Texas. The form of such releases shall be provided by the Debtors. To the extent of the amount of TransCon's Allowed Claim, TransCon shall be entitled to retain its lien in the Garnet State Lease Collateral ("*TransCon's Retained Lien*"). If TransCon's claim is not allowed, TransCon's Retained Lien in the Garnet State Lease Collateral shall be released, and within ten (10) days of the Court's order, TransCon shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

TransCon's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. TransCon's Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 6, and/or 8. On a quarterly basis until paid in full, TransCon's Allowed Claim shall be paid its pro-rata share (with Class 2 and Allowed Claims under Classes 4, 5, 6, and/or 8) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. TransCon's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "*TransCon Payment Deadline*").  If the Debtors fail to pay

TransCon's Allowed Claim on or before the TransCon's Payment Deadline, the Debtors are required to sell sufficient Garnet State Lease Collateral to pay TransCon's Allowed Claim in full. If the Debtors fail to pay TransCon's Allowed Claim in full on or before one year from the TransCon Payment Deadline, TransCon shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of TransCon's Allowed Claim, TransCon shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 8 – The claim of Charger to the extent allowed.  The claim filed by Charger is disputed. Prior to the bankruptcy filing, Charger filed a statutory judgment lien under Texas law that attached to certain of the Debtors' assets ("*Charger's Pre-Petition Lien*"). The Plan provides for Charger's Pre-Petition Lien to be released except as to the Garnet State Lease Collateral and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas. The form of such release shall be provided by Debtors. To the extent of the amount of Charger's Allowed Claim, Charger shall be entitled to retain its lien and security interest in the Garnet State Lease Collateral ("*Charger's Retained Lien*"). If Charger's claim is not allowed, Charger's Retained Lien in the Garnet State Lease Collateral shall be released, and within ten (10) days of the Court's order, Charger shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Charger's Allowed Claim shall accrue interest at the rate of four percent (4%) per annum from and after the Petition Date until it is paid in full. Charger's Retained Lien shall have a first priority lien and security interest against the Garnet State Lease Collateral on a *pari-pasu* basis with the Allowed Claims under Classes 4, 5, 6, and/or 7. On a quarterly basis until paid in full, Charger's Allowed Claim shall be paid its pro-rata share (with Class 2 and the Allowed Claims under Classes 4, 5, 6, and/or 7) of Disposable Income from and after the Effective Date subject to Section 5.03 of the Plan. Charger's Allowed Claim shall be paid in full on the second-year anniversary of the Effective Date (the "*Charger Payment Deadline*"). If the Debtors fail to pay Charger's Allowed Claim on or before the Charger Payment Deadline, the Debtors are required to sell sufficient Garnet State Lease Collateral to pay Charger's Allowed Claim in full. If the Debtors fail to pay Charger's Allowed Claim in full on or before one year from the Charger Payment Deadline, Charger shall be free to pursue any and all remedies it may have under Texas state law, including foreclosure of its Retained Lien. Upon full payment of Charger's Allowed Claim, Charger shall execute and deliver to the Reorganized Debtors an instrument releasing its Retained Lien in full and for all purposes in a form as required to record in the Pecos County Real Property Records.

Class 9 – The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by Von Directional and any related claim against either of the Debtors. The Plan provides for the statutory mineral property lien claim of Von Directional recorded pre-petition to be released and a release of lien instrument issued by the Court

shall be recorded in the appropriate property records of Pecos County, Texas. The form of such release shall be provided by the Debtors. Additionally, the Plan provides for Von Directional to not receive any recovery under the Plan and any pre-petition claim Von Directional has against the Debtors to be released and the Debtors are to release any claim they may have against Von Directional. Von Directional voted to accept the Plan. The Plan provides for a joint and mutual release between the Debtors and Von Directional in which Von Directional shall be released by the Debtors and their bankruptcy estates, and the Debtors and their bankruptcy estates shall be released by Von Directional, from any and all claims, obligations, debts, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their bankruptcy estates, on the one hand, and Von Directional, on the other hand, have asserted or could have asserted, based on or relating to, or in any manner arising from, in whole or in part, the claims asserted in any litigation prior to the confirmation of this Plan, the Debtor's business dealings with Von Directional, and/or the pre-petition mineral liens asserted by Von Directional, and any matters related to the foregoing.

Entry of the Court's Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the release of Von Directional's claims against the Debtors and the bankruptcy estates and the reciprocal release of the Debtors and the bankruptcy estates of their claims against Von Directional, and further, shall constitute the Court's finding that the joint and mutual releases of the Debtors and the Bankruptcy estates, on one hand, and Von Directional, on the other hand, are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise, (c) in the best interests of the Debtors and their estates, (d) fair, equitable, and reasonable, (e) given and made after due notice and opportunity for hearing, and (f) a bar to the Debtors and the bankruptcy estates asserting any claims or causes of action released herein and a bar to Von Directional asserting any claims or causes of action released herein.

Class 10 – The pre-petition statutory mineral property lien filed under Texas Property Code Section 56 by RH Trucking, LLC (and Ricardo & Adelaida Huitron) and any related claim against either of the Debtors. The Plan provides for the statutory mineral property lien claim of RH Trucking, LLC (and Ricardo & Adelaida Huitron) to be released and a release of lien instrument issued by the Court shall be recorded in the appropriate property records of Pecos County, Texas. The form of release shall be provided by the Debtors. RH Trucking, LLC (and Ricardo & Adelaida Huitron) shall not receive any recovery under this Plan. Class 10 is disputed. Class 10 is impaired. Class 10 did not submit a vote on the Plan.

Class 11 – All non-priority unsecured claims under § 502 of the Code. There are no class 11 claims.

Class 12 – Potential creditors listed in Debtors' schedules as disputed but who did not file a proof of claim on or before the bar date of May 1, 2020. There are no class 12 claims.

Class 13 – Pre-petition loans made by Dr. Dria to Debtors.  Prior to the Debtors' bankruptcy filings, the Debtors' principal, Dr. Myra Dria, had loaned to the Debtors approximately $19,000,000. Dr. Dria has agreed to subordinate these loans to any Allowed Claims and she will not receive any payments on account of these pre-petition loans unless and until all Allowed Claims are paid in full.

Class 14 – The Equity Interests of Dr. Dria in Pearl Resources, and Pearl Resources in Pearl Operating.  The equity holder in Pearl Resources, Dr. Dria, shall retain her 100% ownership interest in Pearl Resources.  The equity holder in Pearl Operating, Pearl Resources, shall retain its 100% ownership interest in Pearl Operating.

Taxing Authorities.  Harris County and Pecos County (herein "*Texas Taxing Authorities*") assert that they are Holders of pre-petition Claims for unpaid *ad valorem* real and business personal property taxes (the "*Ad Valorem Tax Claims*"). The Plan provides that the Debtors or Reorganized Debtors, as applicable, pay all Ad Valorem Tax Claims on the later of: (a) twenty Business Days after (i) the Effective Date or (ii) the date on which such Ad Valorem Tax Claims become Allowed Claims, with regard to delinquent taxes, if any, and (b) the date when such Ad Valorem Tax Claims become due and payable in the ordinary course of business; *provided*, *however*, that any Ad Valorem Tax Claims for the 2020 taxable year are not required to be paid prior to January 31, 2021. Year 2019 and prior ad valorem taxes, if any, shall accrue statutory interest from the petition date until paid in full and in the event any Ad Valorem Tax Claims of the Texas Taxing Authorities for year 2020 are paid after the date they become due and payable in the ordinary course of business, the applicable Texas Taxing Authority shall receive interest on such Ad Valorem Tax Claim (a) from the Petition Date through the Effective Date and (b) from the Effective Date until the date of payment in full at the state statutory rate pursuant to Code Sections 506(b), 511, and 1129, as applicable. Each Texas Taxing Authority shall retain the liens that secure the Ad Valorem Tax Claims, and the relative priority of such liens shall continue until the Ad Valorem Tax Claims are paid in full and said tax liens shall not be primed or subordinated by any Exit Financing. In the event that the Debtors or Reorganized Debtors sell any property which secures the ad valorem tax liens, said taxes shall be paid in full prior to disbursement to any other person or entity.

In the event that the Debtor or Reorganized Debtor abandons any property upon which the Texas Taxing Authorities have liens securing any Ad Valorem Tax Claims, the Debtors or Reorganized Debtors, as applicable, shall provide notice of such abandonment and of the occurrence of the effective date to the affected Texas Taxing Authority. The Ad Valorem Tax liens for the 2020 and prior taxable years (if any) shall not be discharged until such time as the amounts owed are paid in full. In the event of a default in the payment of the Ad Valorem Tax Claims as provided herein, the Texas Taxing Authorities shall provide notice to counsel for the Reorganized Debtors regarding such default, and the Reorganized Debtors shall have twenty (20) days from the date of receipt such notice to cure the default. If the default is not cured within such period, the Texas Taxing Authorities shall be entitled to pursue collection of all amounts owed pursuant to applicable non-bankruptcy law. Failure to pay the 2020 Ad Valorem Tax Claims prior to

the state law delinquency date shall constitute an event of default only as to the relevant Texas Taxing Authority. The Debtors' and/or Reorganized Debtors' rights and defenses under Texas state law and the Code with respect to this paragraph, including their right to dispute or object to the Ad Valorem Tax Claims and liens, are fully preserved.

Upon review, the Plan properly classifies claims and interests in accordance with §§ 1122 and 1123(a)(1).[80]   The claims and interests placed in each class are substantially similar to other claims and interests in each such class.  Valid business, factual, and legal reasons exist for separately classifying the various classes of claims and interests created under the Plan, and such classes, and the Plan's treatment thereof, do not unfairly discriminate between holders of claims or interests in each class.  The Plan also provides for the same treatment by Debtors of each claim or interest in each respective class, thereby satisfying § 1123(a)(4).[81]   Thus, the Plan satisfies §§ 1122 and 1123(a).  Accordingly, Debtors' Plan satisfies § 1129(a)(1).

### ii.   Section 1129(a)(2)

Section 1129(a)(2) requires that "[t]he proponent of the plan comply with the applicable provisions of this title."[82]   Among those provisions are the compliance with the disclosure and solicitation requirements, which is the paradigmatic example of what Congress had in mind when it enacted § 1129(a)(2).[83]   Nevertheless, in a subchapter V case, a separate disclosure and solicitation of votes is not required, nor did this Court order that Debtors file a separate disclosure statement.[84]  All that is required in a subchapter V plan is that the debtor include a brief history of its business operations, a liquidation analysis, and projections with respect to the ability of the

---

[80] 11 U.S.C. §§ 1122 and 1123(a)(1).
[81] *See, e.g., In re U.S. Brass Corp.,* 169 F.3d 957, 958 (5th Cir.1999) ("11 U.S.C. § 1123(a)(4) ... requires all creditors within a class be treated the same, unless the creditor who is being treated less favorably agrees to less favorable treatment.").
[82] 11 U.S.C. § 1129(a)(2).
[83] *See In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D .Mo. 1995) ("The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan."); *In re Texaco Inc.,* 84 B.R. 893, 906–07 (Bankr. S.D. N.Y. 1988) (same).
[84] 11 U.S.C. § 1187(c).

debtor to make payments under the proposed plan of reorganization.[85]  As discussed more fully supra, this Court accordingly concludes that Debtors established by a preponderance of the evidence that they have complied with the applicable provisions of the Bankruptcy Code, including the provisions regarding the contents of a subchapter V plan of reorganization, thereby satisfying § 1129(a)(2).

### iii.    Section 1129(a)(3)

Under § 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law."[86]  As an initial matter, the Court concludes that the Plan has not been proposed by any means forbidden by law.[87]  No party-in-interest has suggested otherwise, and leaving that aspect of § 1129(a)(3) aside, the Court focuses on the requirement of good faith.  The Bankruptcy Code does not define the term "good faith," but the Fifth Circuit has stated that the requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.[88]  "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied."[89]  A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.[90]  The standard of proof required by the debtor to prove that a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence.[91]

---

[85] 11 U.S.C. § 1190(1).
[86] 11 U.S.C. § 1129(a)(3).
[87] ECF No. 226.
[88] *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir.1985).
[89] *Id.*
[90] *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993).
[91] *Id.* at 1165.

Debtors have explained their reasons for filing the Plan as follows: "The Debtors operate in a highly competitive business, with competitors who have significantly stronger financial wherewithal. Adjacent operator, Parsley, recently acquired Jagged Peak's adjacent 78,000-acre position for $2.3 billion. Over the past 5 years, Parsley and Jagged Peak have drilled over 40 nearby horizontal wells. These wells have established the existence of high-quality oil assets first identified by Debtors in the area through Dr. Dria's efforts. Given the amount of production from each well, the price of the commodities and the extant litigation involving subcontractors and continual interference by Parsley and/or its agents, the Debtors have been losing money for some period of time. In addition to her initial equity investment of more than $8,000,000 into the Debtors, Dr. Dria has loaned the Debtors over the last 10 years over $19,000,000 to develop production infrastructure to support drilling and completion operations, oil and gas gathering and processing facilities and to drill on the Debtors' oil and gas properties. The Debtors' business has encountered numerous challenges in the last two years: low commodity prices and high service prices continued over an extended period."[92]

In light of Debtors' explanation set forth above and the supporting evidence, and considering the provisions of the Plan, the Court concludes that Debtors established by a preponderance of the evidence that they filed the Plan as part of efforts to reorganize and to preserve Debtors' businesses as going concerns, and thus have proposed the Plan in good faith. Accordingly, the Court finds that § 1129(a)(3) is satisfied.

### iv.    Section 1129(a)(4)

Section 1129(a)(4) provides that "any payment" made or to be made by the plan proponent or the debtor for services "in or in connection with" the plan or the case must be approved by or

---

[92] ECF No. 226 at 7.

"subject to the approval of" the bankruptcy court as "reasonable."[93]  Pre-confirmation payments for

fees and expenses incurred in a bankruptcy case have been held to be within the scope

of § 1129(a)(4).[94]  The requirements under § 1129(a)(4) are two-fold.  First, there must be disclosure.

Second, the court must approve the reasonableness of payments.[95]  Section 1129(a)(4) is designed to

ensure compliance with the Code policy that the bankruptcy court police the awarding of fees in title

11 cases, so that holders of claims and interests derive the benefit of such information as it might

affect their decision to accept or reject the plan.  Here, no party-in-interest has filed an objection to

the Plan regarding this provision.  Additionally, the Court has reviewed the Plan and finds that it

complies with the requirements of § 1129(a)(4).[96]  Accordingly the Plan satisfies § 1129(a)(4).

### v.    Section 1129(a)(5)

Section 1129(a)(5) imposes as a requirement for confirmation that the plan proponent

disclose any individual proposed to serve, after confirmation, "as a director, officer, or voting

trustee of the debtor," and that the holding of such office by each individual "is consistent with the

interests of creditors and equity security holders and with public policy."[97]  Here, the Court notes

that no party-in-interest has filed an objection to the Plan regarding this provision.  Nevertheless, §

1129(a) obligates this Court to make a finding under § 1129(a)(5), whether or not any party has

objected to the plan on § 1129(a)(5) grounds.[98]  In this case, Debtors' Plan proposes to reinstate the

pre-petition management structure of Debtors.[99]  Thus, if Debtors' Plan is confirmed, Dr. Dria once

again will be in full control of Debtors, due to her current ownership and control of Debtors.

---

[93] 11 U.S.C. § 1129(a)(4).
[94] *In re Cajun Elec. Power Co.,* 150 F.3d 503, 513–14 (5th Cir.1998).
[95] 7 Collier on Bankruptcy ¶ 1129.03[4] (16th ed. 2015).
[96] ECF No. 226.
[97] 11 U.S.C. § 1129(a)(5)(A).
[98] *See* 11 U.S.C. § 1129(a) (court "shall confirm a plan only if all of the following requirements are met").
[99] ECF No. 226.

Considering Dr. Dria's expertise in managing Debtors, this Court views that result as acceptable and in compliance with § 1129(a)(5). Accordingly, Debtors' Plan satisfies § 1129(a)(5).

### vi.    Section 1129(a)(6)

Section 1129(a)(6) requires that "any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[100] Such provision is not applicable to Debtors.[101] Accordingly, Debtors' Plan satisfies § 1129(a)(6).

### vii.   Section 1129(a)(7)

Section 1129(a)(**7**) provides:
> (a) The court shall confirm a plan only if all of the following requirements are met:
> . . .
> > (7) With respect to each impaired class of claims or interests—
> > > (A) each holder of a claim or interest of such class—
> > > > (i) has accepted the plan; or
> > > > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date . . . .

Section 1129(a)(7) requires a plan of reorganization meet the "best interests" test, which requires that each dissenting creditor receive at least as much as they would in a hypothetical Chapter 7 liquidation of the debtor.[102] Here, no party-in-interest objected to Plan confirmation on this ground. Nevertheless, the Court finds that under a hypothetical Chapter 7 liquidation of Debtors, all creditors would be paid in full, with interest, which is clearly more than they would receive in a hypothetical liquidation. Debtors also provided a hypothetical liquidation analysis,

---

[100] 11 U.S.C. § 1129(a)(6)
[101] ECF No. 226 at 18
[102] 11 U.S.C. § 1129(a)(7)(A).

which the Court finds credible.[103]  The Court concludes that the requirement of § 1129(a)(7) of the Bankruptcy Code has been satisfied with respect to Debtors' Plan.

### viii.    Section 1129(a)(8)

Section 1129(a)(8) provides that "[w]ith respect to each class of claims or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan."[104] Section 1129(a)(8) is satisfied only if each class under a proposed plan has either accepted the plan or is not impaired under the plan.  Debtors' Plan does not satisfy § 1129(a)(8) as there are eight impaired classes and of the eight impaired classes, only five have accepted the Plan.[105]  However, as set forth above, § 1129(a)(8) is one of three subsections of § 1129(a) that does not have to be satisfied for a subchapter V plan to be confirmed.[106]  A plan that does not satisfy § 1129(a)(8) nonetheless can be confirmed if the plan satisfies the cram down requirements contained in § 1191(b).

Section 1191(b) permits a plan proponent to "cramdown" a plan over a dissenting class if the plan does not "discriminate unfairly" and provides "fair and equitable" treatment to the dissenting classes that are impaired under the plan.  Before a plan proponent may cramdown a plan, it must establish that all of the other requirements of § 1129(a) are met.  Accordingly, the Court will address the remaining requirements of § 1129(a) before discussing the cramdown requirements of § 1191(b).

### ix.    Section 1129(a)(9)

As discussed supra, classification of claims is covered in § 1122, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is

---

[103] *See* ECF No. 226-2.
[104] 11 U.S.C. § 1129(a)(8).
[105] ECF No. 210.
[106] 11 U.S.C. § 1191(b).

substantially similar to the other claims or interests in such class."[107]   A debtor possesses

considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of

reorganization.   While considerable, that discretion is tempered at least with respect to unsecured

priority tax claims.   Section 1123(a)(1) provides that a plan shall "designate, subject to section

1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2),

507(a)(3), or 507(a)(8) of this title, and classes of interests."[108]   Here, no objection to Plan

confirmation on this ground was asserted by any party-in-interest.   Additionally, there are no

unsecured priority tax claims.[109]   The Court therefore concludes that Debtors have demonstrated by

a preponderance of the evidence that the Plan complies with § 1129(a)(9).

### x.   Section 1129(a)(10)

Under § 1129(a)(10), "[i]f a class of claims is impaired under the plan," then it must be the

case that "at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider."[110]   As one court stated,

"[s]ection 1129(a)(10) operates as a statutory gatekeeper barring access to cramdown where there

is absent even one impaired class accepting the plan.   Cramdown is a powerful remedy available to

plan proponents under which dissenting classes are compelled to rely on difficult judicial

valuations, judgments, and determinations.   The policy underlying Section 1129(a)(10) is that

before embarking upon the tortuous path of cramdown and compelling the target of cramdown to

shoulder the risks of error necessarily associated with a forced confirmation, there must be some

other properly classified group that is also hurt and nonetheless favors the plan."[111]

As outlined above, § 1129(a)(10) does not have to be satisfied for a subchapter V plan to be

---

[107] 11 U.S.C. § 1122(a).
[108] 11 U.S.C. § 1123(a)(1).
[109] *See* ECF No. 226.
[110] 11 U.S.C. § 1129(a)(10).
[111] *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773 (S.D.N.Y.).

confirmed.[112]  Nonetheless, in this case, Class 6 – Maverick, Class 8 – Charger, and Class 9 – Von Directional, are all non-insider, impaired classes, that voted in favor of Debtors' Plan.[113] Accordingly, the Court finds that Debtors' Plan meets the requirement of § 1129(a)(10).

### xi.    Section 1129(a)(11)

Section 1129(a)(11) is commonly referred to as the "feasibility" requirement of confirmation.  A debtor's plan is feasible if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[114]  Under the feasibility standard, a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence.[115]  The court need not require a guarantee of success.[116] Essentially, a debtor must be able to show that it can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan.  The bankruptcy court must make a specific finding as to feasibility after engaging in a peculiarly fact intensive inquiry that involves a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute.[117]  To confirm a plan, the bankruptcy court must make a specific finding that the plan as proposed is feasible.[118]

Here, this Court specifically finds that the Plan is feasible and has a reasonable assurance of commercial viability based on the following: (1) that Debtors will be able to service the debt through operations and with an infusion of capital by the principal as stated in the Plan; (2) the earning power of Debtors after the reorganization; (3) the past performance of Debtors' business

---

[112] 11 U.S.C. § 1191(b).
[113] ECF No. 210.
[114] 11 U.S.C. § 1129(a)(11).
[115] *See Matter of T-H New Orleans Ltd. P'ship,* 116l F.3d 790, 801 (5th Cir. 1997).
[116] *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).
[117] *Id.*; *In re Star Ambulance Serv., LLC,* 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).
[118] *In re M & S Assoc., Ltd.,* 138 B.R. 845, 848 (Bankr. W.D. Tex. 1992).

operations; (4) the ability of Debtors' management; and (5) the economic outlook for the oil industry in general.[119]  Accordingly, Debtors' Plan satisfies § 1129(a)(11).

### xii.    Section 1129(a)(12)

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"[120]  Under § 507, such fees are afforded priority as administrative expenses.[121]  The Plan provides for the payment of such fees on the effective date and thereafter, as may be required.[122]  Accordingly, the Court finds that Debtors' Plan complies with § 1129(a)(12).

### xiii.    Section 1129(a)(13)

Section 1129(a)(13) requires that a plan provide for "the continuation of payment of all retiree benefits, at the level established pursuant to § 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits."  Pursuant to the Plan, this section is inapplicable to the instant Debtors.[123]  Accordingly, the Plan satisfies the requirements of § 1129(a)(13).

### xiv.    Section 1129(a)(14)

Section 1129(a)(14) of the Bankruptcy Code requires that if the debtor is mandated by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor must have paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.[124]  Here, Debtors are not required by a judicial or

---

[119] ECF No. 226.
[120] 11 U.S.C. § 1129(a)(12).
[121] *See* 11 U.S.C. § 507(a)(2).
[122] ECF No. 226.
[123] *Id.*
[124] *See* 11 U.S.C. § 1129(a)(14).

administrative order, or by statute, to pay any domestic support obligation; accordingly, the Plan satisfies the requirements of § 1129(a)(14).

### xv.    Section 1129(a)(15)

Section 1129(a)(15) requires that if the debtor is an individual, and the holder of an allowed unsecured claim has objected to confirmation of the plan, the property to be distributed to the holder must be not less than the value required by § 1129(a)(15).[125]  Here, § 1129(a)(15) does not apply because Debtors are not individuals; accordingly, the Plan satisfies the requirements of § 1129(a)(15).

### xvi.    Section 1129(a)(16)

Section 1129(a)(16) requires that all transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust.[126]  Here, upon review, all transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust; accordingly, the Plan satisfies the requirements with § 1129(a)(16).[127]

Now that the Court has determined that Debtors' Plan meets the applicable requirements under § 1129(a), other than § 1129(a)(8), the Court will turn its attention to confirmation of Debtors' Plan pursuant to § 1191(b).

### b.  Confirmation Pursuant to § 1191(b) and "Cramdown"

For a subchapter V plan, § 1191(b) states the rules for confirmation of a non-consensual or "cramdown" plan and replaces the cramdown requirements of § 1129(b), which do not apply in a

---

[125] *See* 11 U.S.C. § 1129(a)(15).
[126] *See* 11 U.S.C. § 1129(a)(16).
[127] ECF No. 226.

subchapter V case.[128]  As discussed at length herein, § 1191(b) permits confirmation even if the requirements of paragraphs (8), (10), and (15) of § 1129(a) are not met.

Under the cramdown rules in § 1191(b), if all other confirmation standards are met, the court must confirm a plan on request of the debtor, if, with respect to each impaired class that has not accepted it, the plan does not (1) discriminate unfairly and (2) is fair and equitable.[129]  These two general standards are the same as the ones that govern in a cramdown under § 1129(b).  While subchapter V does not affect any change in the unfair discrimination requirement, § 1191(c) does provision a new "rule of construction" in subchapter V cases for the condition that a plan be "fair and equitable," replacing the detailed definition of that term contained in § 1129(b).  Subchapter V does not change existing law about permissible cramdown treatment of secured claims because with regard to a class of secured claims, a subchapter V plan is "fair and equitable" if it meets the existing rules for secured claims stated in § 1129(b)(2)(A).[130]  Section 1129(b)(2)(A) states:

> (2)  For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A)  With respect to a class of secured claims, the plan provides—
>
> (i)     (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
>         (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii)    for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment

---

[128] 11 U.S.C. § 1181(a).
[129] 11 U.S.C. § 1191(b).
[130] 11 U.S.C. § 1191(c)(1).

> of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii)   for the realization by such holders of the indubitable equivalent of such claims.

Nevertheless, § 1191(c) does not state a "fair and equitable" rule specifically for unsecured claims. Instead, it imposes a projected disposable income requirement ("best efforts" test), which requires a feasibility finding, and requires that the plan provide appropriate remedies if payments are not made.[131] Notably, in a subchapter V case, the absolute priority rule under § 1129(b)(2)(B) is eliminated for cramdown, which will allow existing owners to retain their full ownership without giving any new value, but only if the plan provides for the debtor to distribute all of its projected disposable income over at least three years from the date the first payment is due under the plan (or property having a value of at least that amount).[132] The absolute priority rule has been replaced with the "fair and equitable" requirement to protect dissenting unsecured classes similar to those requirements found in applicable Chapters 12 and 13 cases and individual Chapter 11 cases. The general standards for confirmation (i.e. that the subchapter V plan does not discriminate unfairly against any impaired, non-consenting class and is fair and equitable) shall be evaluated in light of creditors' objections.

### i.   Objections to Confirmation

The Objecting Creditors each filed separate objections to confirmation; however, substantively each objection raises similar arguments.[133]

First, Objecting Creditors assert that the Plan fails to meet the requirements for a cramdown plan under § 1129(b)(2)(A), made applicable here under § 1191(c)(1), because the Plan as proposed is not fair and equitable as to each creditor's claim because it does not provide

---

[131] 11 U.S.C. § 1191(c).
[132] 11 U.S.C. § 1181(a).
[133] *See* ECF Nos. 205–209.

for the Objecting Creditors to either retain their existing, pre-petition liens, or the indubitable equivalent of their respective claims.[134]  Each Objecting Creditor holds a statutory lien claim against Debtors' assets in Pecos County, Texas, and the Plan proposes to release each of the Objecting Creditors' pre-petition statutory lien and provide a smaller replacement lien on only a portion of Debtors' assets in Pecos County.[135]  The "replacement lien," argues each Objecting Creditor, is not adequately defined in the proposed Plan as it does not state what kind of lien each Objecting Creditor would be granted nor to what property the lien would attach, which fails to meet the cramdown requirements of § 1129(b)(2)(A).[136]

Second, Objecting Creditors assert that "the Plan provides absolutely no specifics on the anticipated amount of Disposable Income, the dates when Disposable Income will be available, or even how Debtors will calculate or report Disposable Income."[137] Specifically, both Pilot Thomas and TransCon assert that (i) Debtors have admitted both in the Plan and at the prior hearing that there may not be any Disposable Income and that the Plan does not rely upon Disposable Income, (ii) the "financial projections" in the Plan are speculative, subject to market conditions and fluctuations, and entirely dependent on major upfront capital financing that is non-existent, (iii) Debtors' monthly operating reports indicate no income during the course of their Chapter 11 cases and potentially no currently operating assets, (iv) Disposable Income inexplicably excludes "monies received by the Debtors from any recovery or settlement under the Debtors' insurance policies issued by Travelers," and (v) Debtors indicated no plan of development under the proposed plan or under oath.[138]  Additionally, Nabors argues that the Plan is overly speculative and is not feasible because "the Plan states that it will pay Nabors from

---

[134] *Id.*
[135] *See* ECF No. 226.
[136] ECF Nos. 120, 205 at 2, and 208 at 1.
[137] ECF Nos. 229 at 8–9, and 231 at 8–9.
[138] *Id.*

Disposable Income from future development for which the Debtors have not provided evidence."[139]   Since all three creditors' objections are substantively similar, the Court will consider them simultaneously.

Here, § 1129(a)(10) was met, although not required to be under § 1191(b), § 1129(a)(15) is not applicable to this case as it only applies to individuals, and this Court has already found that § 1129(a)(8)  has not been met.  Accordingly, in order to be confirmed, the Court will need to determine whether Debtors' jointly administered non-consensual subchapter V Plan meets the requirements of § 1191(b).

As stated supra, § 1191(c) states a new "rule of construction" for the requirement that a plan be "fair and equitable."[140]   The plan is fair and equitable if (i) it proposes to commit all of the debtor's disposable income for the entire term of the plan to making plan payments (or the equivalent thereof); (ii) the debtor is able to make the payments under the plan or there is a reasonable likelihood that the debtor will be able to make the payments; and (iii) the plan provides appropriate remedies, which could include the liquidation of nonexempt assets, to protect creditors if the payments are not made.[141]   Thus, it allows a debtor's equity holders to retain their equity or individual debtors to retain their assets, even if unsecured creditors are not paid in full.[142]   The Court will take each one in turn.

### ii.    The Plan Satisfies the Disposable Income (or "Best Efforts") Test

Cramdown confirmation under the fair and equitable standard first imposes a modified projected disposable income rule, expanded to include all debtors, not just individuals.[143]   The plan must provide that all of the projected disposable income of the debtor received in the three-year

---

[139] ECF No. 230 at 9.
[140] 11 U.S.C. § 1191(c).
[141] 11 U.S.C. § 1191(c)(2) and (3).
[142] 11 U.S.C. § 1191(c).
[143] *Id.*

period after the first payment under the plan is due, or in such longer period not to exceed five years as the court may fix, will be applied to make payments under the plan.[144]  Alternatively, the plan may provide that the value of property to be distributed under the plan within the three-year or longer period, as fixed by the court, is not less than the projected disposable income of the debtor.[145]  The Bankruptcy Code does not define "projected disposable income," but it defines "disposable income" in Chapters 12[146] and 13.[147]  In Chapter 11 cases, § 1129(a)(15) incorporates the Chapter 13 definition.[148]  Section 1191(d) defines disposable income as "income that is received by the debtor and that is not reasonably necessary to be expended for" these specified purposes:

    i.   the maintenance or support of the debtor or a dependent of the debtor;[149] or

    ii.   a domestic support obligation that first becomes payable after the date of the filing of the petition;[150] or

    iii.   payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.[151]

The definition of disposable income in § 1191(d) is substantially the same as the definition of disposable income in § 1225(b)(2).  It is also substantially the same definition as in § 1325(b)(2), except that § 1325(b)(2) permits a deduction for charitable contributions.  The Chapter 11 provision incorporates the Chapter 13 definition.[152]  Unlike Chapter 13, however, § 1191(d) does not incorporate the means test in the calculation of disposable income.  The test for determining what

---

[144] 11 U.S.C. § 1191(c)(2)(A) (The projected disposable income test in Chapter 11 and 12 cases likewise requires the use of projected disposable income to make payments under the plan. §§ 1129(a)(15), 1225(b)(1). This was the rule for Chapter 13 cases until the enactment of Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005. BAPCPA in 2005, which amended 1325(b)(1) to require the use of projected disposable income to make payments to unsecured creditors.).
[145] *Id.*
[146] 11 U.S.C. § 1225(b)(2).
[147] 11 U.S.C. § 1325(b)(2).
[148] 11 U.S.C. § 1129(a)(15).
[149] 11 U.S.C. § 1191(d)(1)(A).
[150] 11 U.S.C. § 1191(d)(1)(B).
[151] 11 U.S.C. § 1191(d)(2).
[152] 11 U.S.C. § 1129(a)(15).

maintenance and support expenditures are "reasonably necessary to be expended" for "maintenance or support" in § 1191(d)(1) in subchapter V cases is the same as it is in Chapter 12 and below-median Chapter 13 cases, and as it was in Chapter 13 cases prior to the introduction of the means test standards in BAPCPA.[153]   Additionally, for subchapter V cases, § 1191(c)(2) provides for a commitment period of three years or such longer time, not to exceed five years, that the court fixes.[154]   The five-year maximum commitment period in a subchapter V case is the same as the longest minimum commitment period under the Chapter 11 and above-median Chapter 13 tests.[155]   Section 1191(c)(2), however, contains no standards for fixing the commitment period.   The involvement of the Court in choosing the commitment period is unique to subchapter V cases.

Here, the Court finds persuasive Dr. Dria's testimony supporting the proposition that the development of the West Acreage will generate income included to determine Disposable Income distributed under the Plan, which will inure for the benefit of the Objecting Creditors.[156] Additionally, the Plan provides for the distribution of Debtors' Disposable Income to holders of Allowed Claims, including the Objecting Creditors, if and when an Objecting Creditor is determined to hold an Allowed Claim.[157]   Until the Objecting Creditors' claims are fully adjudicated, their pro-rata share of Disposable Income (calculated based on the amount of each respective proof of claim) will be set aside in a claim reserve account held by the SBRA Trustee,

---

[153] *See* 11 U.S.C. § 1191(d)(1).
[154] 11 U.S.C. § 1191(c)(2).
[155] The maximum commitment period in a Chapter 12 case is five years. § 1225(b)(1)(B). Chapter 13 sets specific commitment periods of three years for below-median debtors, § 1325(b)(4)(A), and five years for above-median debtors, § 1325(b)(4)(B). The commitment period in a Chapter 11 case is the longer of five years or the period for which the plan provides for payments. § 1129(a)(15).
[156] ECF No. 226.
[157] *Id.*

as previously directed by this Court.[158]   Moreover, the SBRA Trustee will act as the disbursing

agent and monitor Debtors' compliance with the requirements of the Plan.[159]

The Plan provides for the Objecting Creditors to be paid in the relatively short time

period of two (2) years, with interest, if their claims are allowed.[160]   If an Allowed Claim is not

paid in two years from Disposable Income, then Debtors have the affirmative obligation to sell

assets sufficient to pay Allowed Claims in full.[161]   If Allowed Claims are not paid on or before

the 34th month after the Effective Date of the Plan, then the holder of any unpaid Allowed Claim

secured by the Retained Lien  will also be provided a lien in whatever interest Debtors then have

in the West Acreage ("*Springing Lien*").[162]   If Allowed Claims are not paid on or before the

third-year anniversary of the Effective Date of the Plan, the holders of unpaid Allowed Claims

may foreclose on the Garnet State Lease Collateral covered by the Retained Lien as well as the

property covered by the Springing Lien.[163]   Finally, Debtors will continue to have full recourse

and all of their assets will be available to satisfy unpaid Allowed Claims.[164]   Accordingly, the

Court finds that Debtors' Plan satisfies the disposable income test under § 1191(c)(2)(A).

### iii.   The Plan is Feasible and Provides Remedies for Default

Section 1191(c)(3) adds two additional factors to the "fair and equitable" analysis.  First,

§ 1191(c)(3)(A) requires that the debtor be able to make all payments under the plan,[165] or that

there is a reasonable likelihood that the debtor will be able to make all payments under the

plan.[166]   The new requirement fortifies the more relaxed feasibility test that § 1129(a)(11)

---

[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] 11 U.S.C. § 1191(c)(3)(A)(i).
[166] 11 U.S.C. § 1191(c)(3)(A)(ii).

contains.  Section 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need for further reorganization unless the plan proposes it.[167]  Second, § 1191(c)(3)(B) requires that the plan provide appropriate remedies to protect the holders of claims or interests if the debtor does not make the required plan payments.[168]  The feasibility requirement for confirmation requires a showing that the debtor can realistically carry out its plan.[169]  Though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet.[170]

Here, the Court gives great weight to Dr. Dria's uncontroverted testimony and finds that there is a reasonable likelihood that Debtors will successfully develop the West Acreage and generate sufficient revenue so that their Disposable Income will be sufficient to pay Allowed Claims within two years.[171]  The value of the Garnet State Lease Collateral covered by the Retained Lien (approximately $7.4 million) is significantly greater than the absolute highest amount that the Allowed Claims could total in the aggregate (approximately $1.2 million), so that if the Allowed Claims are not paid in full through the distribution of Disposable Income within two years, it is likely that Debtors will be in a position to generate sufficient funds from the sale of their assets to pay the Allowed Claims in full prior to the time the Springing Lien is triggered.[172]

Moreover, Dr. Dria testified, and the Plan provides, that Debtors will sell property to satisfy Allowed Claims if they are not otherwise paid from Disposable Income by the end of the second-year anniversary of the Effective Date of the Plan.[173]  Dr. Dria also testified, without objection, as to the value of Debtors' assets and her opinion that Debtors will have no difficulty

---

[167] 11 U.S.C. § 1129(a)(11).
[168] 11 U.S.C. § 1191(c)(3)(B).
[169] *In re Lakeside Global, II, Ltd.*, 116 B.R. at 506.
[170] *Id.*
[171] *Id.*
[172] ECF No. 226.
[173] *Id.*

in selling sufficient assets to pay unpaid Allowed Claims, if such becomes necessary.[174]   The Court finds that in light of the evidence, Debtors will be able to realistically carry out their Plan. Accordingly, Debtors' Plan meets the requirements of § 1191(c)(3).

### iv.   The Plan Meets the Requirements of § 1129(b)(2)(A)

Lastly, under the fair and equitable standard in a subchapter V case, the requirements in § 1129(b)(2)(A) for cramdown confirmation regarding a class of secured claims remain applicable.[175]   As an initial matter, each of the Objecting Creditors hold claims that have not yet been allowed, as they are subject to pending adversary complaints contesting the validity of their claims.[176]   Currently, however, the Objecting Creditors are secured by mineral interests in Debtors' property.[177]   There is no dissenting unsecured class of creditors.   A full discussion regarding the fair and equitable requirement for a dissenting unsecured class of creditors therefore is reserved for another day.

Section 1129(b)(2)(A)(iii) provides that the condition for a plan to be fair and equitable with respect to a class of secured claims may be satisfied if it provides "for the realization by such holders of the indubitable equivalent of such claims."[178]   First, the indubitable equivalent is tied to a "claim," not the property securing the claim.   This is an important distinction because the Objecting Creditors vehemently argue that Debtors cannot modify their lien rights in any fashion and still satisfy the indubitable equivalent standard.[179]   The Objecting Creditors focus their attention on the pre-petition collateral, as opposed to their claims.

---

[174] Min. Entry (08/13/2020).
[175] 11 U.S.C. § 1191 (c)(1).
[176] *See* ECF Nos. 81, 105, 132.
[177] Min. Entry (08/13/2020).
[178] 11 U.S.C. § 1129.
[179] *See* ECF Nos. 229–231.

In considering whether the Plan provides for the realization of the indubitable equivalent of the claims, it is important to keep in mind that the aggregate amount of remaining disputed claims that have asserted liens against Debtors' assets are approximately $1.2 million.  Thus, if all of the disputed claims are adjudicated 100 percent in favor of the Objecting Creditors, the total amount of allowed secured claims will be approximately $1.2 million.  Assuming this worst-case scenario for Debtors becomes a reality, the value of Debtors' property subject to the disputed pre-petition liens is valued at approximately $35 million, meaning there would be a 29 to 1 value-to-debt equity cushion.  The Objecting Creditors argue that this cushion must be maintained for Debtors to satisfy the indubitable equivalent standard.  The Court finds this argument without merit as the Plan satisfies the indubitable equivalent standard found under § 1129(b)(2)(A)(iii).

The Fifth Circuit has expressly recognized that one accepted method of providing indubitable equivalence is the exchange of collateral.[180]  Whether the indubitable equivalent offered is equivalent is a matter left to the discretion of the bankruptcy court in its careful reliance upon sufficient facts.[181]  Courts should not accept offers of indubitable equivalence lightly and should insist on a high degree of certainty.[182]  Moreover, indubitable equivalence is a flexible standard.[183]  The indubitable equivalent standard requires a showing that the objecting secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are completely compensatory, meaning that the objecting creditor is fully compensated for the rights it is giving up.[184]  For example, the Fifth Circuit has stated that

---

[180] *In re Sun Country Dev., Inc.,* 764 F.2d at 408.

[181] *Id.*; *In re Walat Farms, Inc.*, 70 B.R. 330, 336 (Bankr. E.D. Mich. 1987) ("a bankruptcy court is permitted, indeed required, to make these determinations on a case by case basis and to order confirmation of a plan which indubitably protects and pays the claim of an objecting creditor").

[182] *In re Swiftco, Inc.*, 1988 WL 143714 (Bankr. S.D. Tex. Oct. 5, 1988).

[183] *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 568, (E.D. Pa. 2009).

[184] *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298 (B.A.P. 10th Cir. 2006) ("Substitute collateral with a value projected to be equal to, or even more than, original collateral securing creditor's claim is not "completely compensatory," and does not provide secured creditor with "indubitable equivalent" of its secured claim, if new collateral is so much

the "[a]bandonment of the collateral to the class would satisfy indubitable equivalent, as would a replacement lien on similar collateral."[185]

In *Investment Company of The Southwest*, the court recognized that a debtor may be permitted to use some portion of the equity cushion in collateral to help implement a plan without violating the indubitable equivalent standard, as long as the secured creditor remains over-secured beyond a reasonable doubt and has sufficient protection.[186]   Courts have approved plans that did not pay a secured lienholder all of its collateral sale proceeds, as long as the court is satisfied that there will always be more value in the remaining collateral than the lender's lien amount. [187]   Courts also have routinely held that a partial surrender of collateral to an over-secured creditor provides such creditor with the indubitable equivalent of its claim.[188]   A sister Court approved a plan over the objection of a secured creditor finding the debtor had provided the indubitable equivalent because the secured creditor remained over-secured beyond a reasonable doubt and had sufficient payment protection over the life of the plan.[189]   In essence, in the bankruptcy context, the indubitable equivalent means that the treatment afforded the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim, and also insure the integrity of the creditor's collateral position.[190]

Here, the Objecting Creditors argue that the Plan does not insure the safety of the principal (i.e., the amount of their Allowed Claims, if and when allowed) because under the Plan

---

riskier than original collateral that there is substantially greater likelihood that secured creditor will not ultimately be paid.").

[185] *In re Pac. Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009).

[186] *In re Inv. Co. of The Southwest, Inc.*, 341 B.R. 298, 325 (B.A.P. 10th Cir. 2006).

[187] *See In re Pine Mountain, Ltd.*, 80 B.R. 171 (B.A.P. 9th Cir. 1987) ("it was unlikely that creditor's claim would ever become even partially unsecured, and plan provided secured creditor with variety of safeguards and fair interest rates"); *see also Affiliated Nat'l Bank-Englewood v. TMA Assocs., Ltd. (In re TMA Associates, Ltd.)*, 160 B.R. 172, 174 (D. Colo. 1993).

[188] *In re May*, 174 B.R. 832, 838–839 (Bankr. S.D. Ga. 1994).

[189] *In re SCC Kyle Partners, Ltd.*, 2013 WL 2903453 (Bankr. W.D. Tex. June 14, 2013).

[190] 4 Collier on Bankruptcy ¶ 506.03 (16th 2020).

they no longer enjoy a 29 to 1 value-to-debt cushion.[191]   However, the Plan provides virtual certainty that Allowed Claims will be paid in full.[192]   The overwhelming evidence demonstrates that the property on which the Objecting Creditors retain a lien, (the Garnet State Lease Collateral,) is valued at $7.4 million.   That provides a 6 to 1 value-to-debt equity cushion. Despite the fact that Objecting Creditors are adequately protected by an equity cushion in excess of $6 million (i.e., $7.4 million v. $1.2 million), the Objecting Creditors nevertheless launch a failed attempt at persuading this Court of two alternative arguments – first, that a Texas mineral lien is sacrosanct and may not be modified in a plan under any circumstances, and second, that lien-stripping may not be accomplished under any circumstances.[193]   Both of these arguments are without merit.

The Objecting Creditors argue that a Texas statutory mineral lien must be treated differently than any other lien.   The Objecting Creditors, however, offer no authority whatsoever to support their assertion.   Under § 1123(a)(5)(E), a plan may modify any lien.[194]   This includes even an IRS lien for unpaid taxes.[195]   Just like IRS liens, or any other liens, statutory mineral liens may be modified over objection under § 1123(a)(5)(E), as long as § 1129(b)(2)(A) is satisfied.   Neither the Bankruptcy Code nor case law provide statutory mineral liens extra protection.   Recently, the Fourth Circuit approved a "partial dirt for debt" plan treatment over the objection of the secured creditor because the plan provided the secured creditor with the indubitable equivalent of its claim.[196]   The secured claim was $14.6 million and the plan provided for the payment of $1 million and property valued at $13.7 million in exchange for the release of the secured

---

[191] *See* ECF Nos. 205–209.
[192] ECF No. 226.
[193] Min. Entry (08/13/2020).
[194] 11 U.S.C. § 1123.
[195] *In re Johnson*, 386 B.R. 171, 175–176 (Bankr. W.D. Pa. April 16, 2008).
[196] *In re Bate Land & Timber, LLC*, 877 F.3d 188 (4th Cir. 2017).

creditor's pre-petition collateral.[197]   The Fourth Circuit rejected any notion that a partial dirt for debt plan is *per se* not confirmable.[198]   The key is whether the treatment in the plan provides the objecting secured creditor the indubitable equivalent of its claim.

In essence, the Objecting Creditors complain that all they are receiving under the Plan is a Retained Lien in the Garnet State Lease Collateral and then are left to fend for themselves.  This contention misreads the Plan.  This Court already found that the Garnet State Lease Collateral is very valuable and Debtors do not plan to surrender it to the holders of Allowed Claims, even if all of the disputed claims are allowed in full.  Debtors' plan is to redevelop the east 160 acres, but at this time their resources are best utilized in developing the West Acreage.  Dr. Dria testified as such and further testified that the prospects of developing the West Acreage with liens in place are not good and that the pre-petition liens of the Objecting Creditors would chill Debtors' ability to attract an investor to assist in the development of the West Acreage.[199]  But, with the West Acreage unencumbered, Debtors will, in all reasonable certainty, be successful in developing such property. The Objecting Creditors stand to benefit from the development, and they will retain their liens in the Garnet State Lease Collateral should the development not go as planned.  Moreover, the Objecting Creditors will be provided the Springing Lien if their Allowed Claims are not paid on a timely basis and Debtors will continue to remain fully liable on a recourse basis for the entire unpaid amount of Allowed Claims.[200]

Further, the cases relied on by the Objecting Creditors are inapposite because those cases simply hold that the debtors did not satisfy the indubitable equivalent standard.[201]   In *CRB*

---

[197] *Id.*
[198] *Id.*
[199] Min. Entry (08/13/2020).
[200] ECF No. 226.
[201] See *In re CRB Partners, LLC*, 11-11915, 2013 WL 796566 (Bankr. W.D. Tex. March 4, 2013); *see also In re Swifico, Inc.*, 1988 WL 143714; and *Inv. Co. of The Southwest*, 341 B.R. 298.

*Partners*, the court recognized that a plan may be confirmed over a secured creditor's objection when the debtor proposes to surrender only a portion of the collateral as long as there is a sufficient equity cushion in the property surrendered to protect the creditor and assure payment.[202]  The court did not confirm the plan because it determined that the equity cushion for a claim of approximately $1,340,000 was only $2.73.[203]  Here, the Plan does not propose to surrender the Garnet State Lease Collateral to the Objecting Creditors.  Unlike that case, Debtors' Plan provisions for the Objecting Creditors to retain a lien in such property and offer other protections to assure payment if their claims are allowed, not the least of which is an equity cushion in excess of $6 million to cover disputed claims with the aggregate face value of approximately $1.2 million.

In *Swiftco,* the court again recognized that under the Fifth Circuit holding in *Sun Country*, a plan may be confirmed under the indubitable equivalent standard if there is no reasonable doubt that the creditor will realize the full value of its allowed claim.[204]  The court in *Swiftco* determined that there was a reasonable doubt of payment because there was little to no equity cushion and the payout was too long.[205]  The plan proposed in *Swiftco* was much different than the instant Plan and the objecting creditor was a third-priority lien holder with little or no equity cushion, being asked to wait six (6) years for full payment.[206]  Here, and under the instant Plan, the Objecting Creditors have a first lien in the Garnet State Lease Collateral with a substantial equity cushion.  Moreover, the Objecting Creditors will be paid their pro rata share of Disposable Income, and if they are not paid in full in two years, it is incumbent upon Debtors to sell property

---

[202] *CRB Partners*, 2013 WL 796566 at *5-6.
[203] *Id.*
[204] *In re Swiftco,* 1988 WL 143714 at *11-14.
[205] *Id.*
[206] *Id.* (The court stated that "the debtor has not shown that there is or will be a buyer who will probably buy the property in the next few years at any price and especially not at $5,000,000. The debtor has failed to persuade the court that any lender will refinance the existing indebtedness.")

of a sufficient value to pay the Objecting Creditors' Allowed Claims in full.  Additionally, the West Acreage development will inure to the benefit of the Objecting Creditors.

The common thread through all of the cases evaluating whether the objecting secured creditor has been provided the indubitable equivalent of its claim is certainty of payment beyond a reasonable doubt and adequate plan protections.  When assessing these requirements, the Court finds that the Plan more than satisfies the stringent indubitable equivalent standard.  The Plan provides 6 to 1 valueto-debt equity cushion.  Debtors' liability remains recourse and Debtors commit to use their best efforts to develop the West Acreage, which will inure to the benefit of the Objecting Creditors, as well as all creditors.  Debtors remain responsible to sell sufficient assets to pay Allowed Claims that are not paid within two years.  And, if Debtors are unable to perform, the Objecting Creditors have their Retained Lien (on property valued at $7.4 million), as well as the Springing Lien.  Dr. Dria's valuation testimony supports Debtors' contention that the Retained Lien, along with the other protections in the Plan, provide the Objecting Creditors with the indubitable equivalent of their claims, even when viewed through a stringent indubitable equivalent standard. In light of the evidence and testimony discussed herein, the Court finds that Debtors' Plan satisfies § 1129(b)(2)(A).

Accordingly, when  all other confirmation standards  are  met,  except those set out in paragraphs (8), (10), and (15),  the cramdown rules under § 1191(b) provide that the court shall confirm a nonconsensual plan, on request of the debtor, if (with respect to each impaired class that has not accepted it) the plan (1) does not discriminate unfairly and (2) is fair and equitable. Therefore, for the reasons discussed herein, and pursuant to § 1191(b), Debtors' Plan[207] is confirmed.

---

[207] ECF No. 226.

### III.    <u>CONCLUSION</u>

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED 09/30/2020.

_____
Eduardo V. Rodriguez
United States Bankruptcy Judge